

*I IS 21 Days*

**Amy Halikman, M.D.**
5138 Hazeltine Ave., # 2
Sherman Oaks, California 91423
Telephone: (818) 986-9018

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

-------------------------------------------------------------------- x

**DR. AMY HALIKMAN,**

    Plaintiff,

       — against —

**KRISTIN SCHAAD NELSON,** individually **and** in her official capacity, and
**DR. JODY HELMICK,** individually and in her official capacity, and
**DR. ROBERT KANTOR,** individually and in his official capacity, and
**DR. JEANETTE VELARDE-DUNBAR,** individually and in her official capacity, and
**DR. MATTHEW SHELLEY,** individually and in his official capacity, and
**MR. FRAN CHRISTY,** individually and in his official capacity, and
**MS. CELESTE UTLEY,** individually and in her official capacity, and
**DR. AMIN HAKIM,** individually and in his official capacity, and
**DR. WILLIAM O'BRYANT,** individually and in his official capacity, and
**UNITED HEALTHCARE,** inclusive,

    **Defendants.**

**CASE NUMBER** CV 19- 01605- MWF-Ex
Amended

## COMPLAINT FOR DAMAGES

1. **DISCRIMINATION & HARASSMENT BASED ON DISABILITY OR MEDICAL CONDITION** (Cal.Gov.Code 12900, et seq.)
2. **DISCRIMINATION & HARASSMENT BASED ON RELIGION** (Cal.Gov.Code 12900, et seq. & Cal.Gov.Code 12940)
3. **DISCRIMINATION & HARASSMENT BASED ON GENDER** (Cal.Gov.Code 12900, et seq.)
4. **FAILURE TO PROVIDE REASONABLE ACCOMMODATION**
5. **FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS**
6. **FAILURE TO PREVENT HARRASSMENT, DISCRIMINATION and RETALIATION** (Cal.Gov.Code 12900, et seq., Cal.Gov.Code 12940(k))

------------------------------------------------------------------------- x

7.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
8.  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
9.  WRONGFUL CONSTRUCTIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY
10. RETALIATION IN VIOLATION OF CALIFORNIA FALSE CLAIMS ACT (Gov.Code 12653)
11. WAGE THEFT
12. SLANDER, LIBEL
13. DEFAMATION PER SE
14. INVASION OF PRIVACY & VIOLATION OF HIPAA PRIVACY RULE
15. BREACH OF IMPLIED COVENANT OF GOOD FAITH FAIR DEALING

DEMAND FOR

JURY TRIAL

COMPLAINT FOR DAMAGES

1. Plaintiff, Amy Halikman, M.D. (*"Dr. Halikman"* or *"Plaintiff"*) is a Board Certified physician and surgeon and a resident of Los Angeles County, California.

2. Defendant, Ms. Kristin Schaad Nelson, O.D.    ("*Nelson*") works for UNITED HEALTHCARE where she is a Senior Medical Director for the Commercial lines of business, Employer & Individual Insurances. She is an Arizona resident [Phone(s): (480) 334-9204; Alternative phone: (480) 699-5753; (952) 202- 8289], **Dr. Kristin Schaad Nelson's address is: # 3140 N. 47 Place, Phoenix, Arizona 85018-6512.**

3. Defendant Robert Kantor, M.D.  ("*Kantor*") worked for UNITED HEALTHCARE as a Senior Medical Director in their Commercial line of business, Employer & Individual Insurance. He recently became the Chief Medical Officer (C.M.O.) for a major health insurance carrier in Minneapolis, Minnesota. He is a resident of Minneapolis, Minnesota [Phone (612) 968-0474; **Dr. Robert Kantor's address is: # 4520 Pleasant Avenue, Minneapolis, Minnesota  55419.**

4. Defendant Jody Helmick, M.D. ("*Helmick*") works for UNITED HEALTHCARE as a Medical Director and Team Lead.  She is a resident of Adel, Iowa. (Main Telephone (515) 250-1241); Landline: (515) 993-4021; (515) 249-3881.  **Dr. Jody Helmick's address is: # 30481 Puckerbrush Road, Adel, Iowa 50003-8583.**

5. Defendant Jeanette M. Velarde-Dunbar, M.D.   ("*Velarde*") works for UNITED HEALTHCARE.  She is a Vice President at UNITED HEALTHCARE, and she is an Albuquerque, New Mexico resident. [Telephone (505) 299-8861, Alternative phone(s): (952) 202-5772], **Dr. Jeanette M. Velarde is also known as Dr. Jeanette M. Dunbar.**

Her address is: # 13600 Cedarbrook Avenue, NE, Albuquerque, New Mexico 87111.

6.  Defendant Matthew Shelley, M.D.  ("*Shelley*") works for UNITED HEALTHCARE.  He is currently a Vice President at UNITED HEALTHCARE, and he is a Portland, Oregon resident. [Telephone (503) 603-7115], **Dr. Matthew Shelley's address is:  # 13197 N.W.  Helen Lane, Portland, Oregon  97229-7045.**

7.  Defendant William O'Bryant, M.D.  ("*O'Bryant*") works for UNITED HEALTHCARE. He is a Senior Medical Director at UNITED HEALTHCARE, and he is currently a resident of San Antonio, Texas. [Telephone (949) 632-4410, Alternative telephone (949) 632-0322], **Dr. William O'Bryant's address is: # 3425 Chickasaw, San Antonio, Texas 78261-2139.**

8.  Defendant Mr. Fran Pelletier Christy ("Christy") works for UNITED HEALTHCARE where he is the Director of Employee Relations. He is a resident of Minnesota [Telephone (612) 636-8249 (cellphone) & work phone: (952) 351-6422], **Mr. Fran Christy's home address is: # 2820 Overlook Drive, Minneapolis, Minnesota  55431**

9.  Defendant Amin Hakim, M.D. ("Dr. *Hakim*") worked for a UNITED HEALTHCARE as Vice President in the Commercial line of business. He is currently a New York City resident. [Telephone (212) 216- 6910 and (718) 605-0935], **Dr. Amin Hakim's address is: # 515 East 89 Street, Apartment # 1-C, New York,  New York 10128.**

10. Defendant Ms. Celeste Utley ("Utley") works for UNITED HEALTHCARE in Employee Relations and she is a resident of Springs, Texas. [Telephone (281) 907-6156], **Ms. Celeste Utley's address is:  c/o United Health Group, # 9900 Bren Road E.,**

**Minnetonka, Minnesota   55343.**

11. United HealthCare ("*United HealthCare*") is a corporation headquartered and incorporated in Minnesota. United has corporate offices in Minnesota and also in Orange County, California. **(United HealthCare's Address: UNITED HEALTHGROUP # 9900 Bren Road E., Minnetonka, Minnesota 55343).**

("*Nelson,*" "*Helmick,*" "*Velarde,*" "*Kantor,*" "*Hakim,*" "*Shelley,*" "*Christy,*" "*Utley,*" "*O'Bryant,*" together with *United HealthCare/ United Health Group -"Defendants"*).

## COMPLAINT FOR DAMAGES

1. **HARASSMENT (CAL. GOV. CODE 12940)**

2. **DISCRIMINATION (CAL GOV CODE 12940)**

3. **FAILURE TO PROVIDE REASONABLE ACCOMMODATION**

4. **RETALIATION IN VIOLATION OF (CAL GOV. CODE 12940)**

5. **FAILURE TO PREVENT DISCRIMINATION, HARASSMENT AND RETALIATION (CAL GOV CODE 12940)**

6. **INVASION OF PRIVACY**

7. **WRONGFUL CONSTRUCTIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY**

8. **DEFAMATION PER SE, COLLUSION & CONSPIRACY**

9. **SLANDER**

**10. LIBEL**

**11. WAGE THEFT**

**12. VIOLATION OF HIPAA PRIVACY RULE**

**13. BREACH OF IMPLIED COVENANT OF GOOD FAITH FAIR DEALING**

**14. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

## PARTIES

12. Plaintiff is informed and believes and on that basis alleges that each named Defendant is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries were proximately caused by the conduct of such Defendant.

13. Plaintiff is informed and believes and thereupon alleges that Defendants, and each of them, conspired and agreed among themselves to do the acts complained of herein and were, in doing such acts, acting pursuant to and in furtherance of said conspiracy, and each Defendant sued herein is both jointly and severally responsible and liable and individually responsible and liable to plaintiff for the damages alleged herein.

14. Whenever and wherever reference is made to individuals who are not named as defendants in this complaint but are or were employees/agents of defendants, or any of them, such references shall be deemed to mean that such individuals at all relevant times acted on behalf of Defendants within the scope of their employment.

## GENERAL ALLEGATIONS & NATURE OF ACTION

15. Dr. Halikman began working for United HealthCare in 2013 as a Full-Time-Telecommuting Medical Director in United's Commercial line of business known as Employer & Individual "E&I"). Dr. Halikman's primary job duty was to review cases in Prior Authorization, though additional job duties outside of the scope of the job description were added during the course of her Employment.

16. Drs. William O'Bryant, Robert Kantor and Kristin Schaad Nelson are all Senior Medical Directors at United in the Commercial line of business "E&I." They oversaw Dr. Halikman's work and functioned as her direct Supervisors.  Nelson, Kantor and O'Bryant also reported to Dr. Jeanette Velarde-Dunbar, Dr. Matthew Shelley and Dr. Amin Hakim.

Drs. Velarde and Shelley are both Vice Presidents at United HealthCare. Dr. Hakim was a Vice President at United HealthCare.

17. Dr. Halikman's full-time telecommuting position allowed her to work from her home office located in Los Angeles County, California.

## <u>NATURE OF THE ACTION</u>

18.    Plaintiff complains that "Defendants" and her former employer, United HealthCare, engaged in the unlawful discrimination and subsequent retaliation of Plaintiff in the terms, conditions, and privileges of her Employment as follows:

a. Defendants' continued intentional discriminatory, harassing and retaliatory and unlawful behaviors led to termination of Plaintiff's employment (constructive discharge) due to Plaintiff's disabilities (Spinal Stenosis, Hand & wrist orthopedic Injuries and Generalized Anxiety Disorder/PTSD), Defendants' perception that Plaintiff was disabled, and/or Plaintiff's history or record of disability, in violation of CAL. GOV. CODE 12940 AS WELL AS the Americans with Disabilities Act of 1990 ("ADA"), The Civil Rights Act of 1964, The Equal Pay Act of 1963 ("EPA"), the Fair Employment and Housing Act ("FEHA"), California State Human Rights Laws, Los Angeles City Human Rights Laws, Los Angeles Civil and Human Rights Ordinance 18-0086 ("California Government Codes, Acts, Ordinances and Laws,"); and

b. Defendants' failure to provide Plaintiff with a reasonable accommodation in violation of the aforementioned "California Government Codes, acts, ordinances and laws," and

c. Defendant's elimination of multiple already granted accommodations from the
Plaintiff in an attempt to inflict harm and constructively discharge her from her
position; and

d. Defendant's elimination of telecommuting status from the Plaintiff in an attempt
to constructively discharge her from her position and intentionally inflict
emotional distress and physically harm the Plaintiff;  (Wrongful constructive
discharge) and

e. Defendant's intentional infliction of emotional distress as well as physical harm;
and

f. Defendants' continued intentional discriminatory, harassing and retaliatory and
unlawful behaviors led to termination of Plaintiff's employment (constructive
discharge) due to Plaintiff's religious beliefs; and

g. Failure to provide appropriate accommodations for those religious beliefs; and

h. Failure to provide requested religious accommodation on the day of and the days
following the death of Dr. Halikman's father; and

i. Malicious, cruel, inhumane and intentional infliction of emotional distress by
Kristin Schaad Nelson on the day of the death of the Plaintiff's father; and

j. Failure of Dr. Kristin Schaad Nelson to provide the requested religious
accommodation during the Plaintiff's period of mourning in accordance with Dr.
Halikman's religious beliefs and failure to notify Employee Relations of that
request in a timely fashion; and

k. Repeated failure to provide the requested religious accommodation during the
Plaintiff's religious observance of her Sabbath; and

9

l.  Defendant's failure to provide a non-hostile work environment throughout the Plaintiff's employment; and

m.  Defendants' continued intentional discriminatory and unlawful behaviors led to termination of Plaintiff's employment due to Plaintiff's religion in violation of "California Government Codes, Acts, Ordinances and Laws"; and

n.  Defendant's failure to provide Plaintiff with a reasonable accommodation in violation of Los Angeles City, California State and Federal Laws; and

o.  Defendants' multiple violations of Plaintiff's rights to privacy under the HIPAA Privacy Rule; and

p.  Defendants' slander and libel of the Plaintiff and Defamation of character of the Plaintiff's name and reputation; and

q.  Defendants' continued slander and libel of the Plaintiff and Defamation of character of the Plaintiff's name and reputation even after she left her job at UnitedHealthCare; and

r.  Defendants' unrelenting harassment of the Plaintiff in an attempt to interfere with her ability to do her job and cause her harm; and

s.  Defendants' creating a hostile work environment in which no individual could be expected to work; and

t.  Defendants' multiple retaliations for Plaintiff's participating in protected activities; and

u.  Defendants' failure to train the Plaintiff on-site in Minnesota at the start of her Term of Employment as they had all of the other Medical Directors hired at the same time or just before the Plaintiff; and

10

v.  Defendants' failure throughout her employment to provide standard issue equipment similar to other of her colleagues doing the same job; and

w.  Defendants' failure to provide properly or adequately functioning equipment at all times throughout her employment similar to other of her colleagues doing the same job; and

x.  Defendant's violation of the Plaintiff's right to privacy in the course of her employment with the Defendant; and

y.  Defendant's wage theft in denying Plaintiff her earned and non-discretionary 2017 wages; and

z.  Defendant's continued intentional discriminatory and unlawful behavior under the Equal Pay Act of the United States;

aa. Defendants' failure to prevent discrimination, harassment and retaliation; and

19.     Plaintiff files this action to seek monetary relief for the denial of equal employment opportunity and for the unlawful employment practices of Defendant.

20.     Plaintiff further complains that she has suffered, is suffering and will continue to suffer severe economic and non-economic damages because Defendant deprived Plaintiff of her employment rights in violation of all applicable federal and state law and Los Angeles City law.

21.     On or about June 6, 2018, Plaintiff filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("*EEOC*"), which bore charge number 846-2018-09543.

22.     Plaintiff timely brings this action within ninety (90) days of the receipt of a Notice of Right to Sue Letter ("*NORTS Letter*"), issued by the U.S. Department of Justice (Los Angeles District Office U.S. Equal Employment Opportunity Commission) on December 7, 2018.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over Plaintiff's claims under The Americans with Disabilities Act ("*ADA*") and the Equal Pay Act ("EPA") and ("FEHA") as well as under Cal. Gov. Code 12940.

24.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(a) and Cal. Gov. Code 12940. Venue in this matter is properly laid in the District because the violations of the Plaintiff's Federal and State civil rights occurred at the Plaintiff's home office location which is in this District, because the Defendant does business in this District, and because most of the fact witnesses and evidence are common to or most convenient to this District.

## PARTIES

25.     Plaintiff is an individual who, at all times relevant to this Complaint, has resided and currently resides at 5138 Hazeltine Avenue, Apartment 2, Los Angeles, California 91423, County of Los Angeles.

26.     At all times relevant herein, Plaintiff was an "Employee" within the meaning of ADA, California State Law, Federal Law and City of Los Angeles Laws and thus, afforded protection against disability discrimination and retaliation in employment on the basis of her disability. Cal. Gov. Code 12940

27.     United HealthCare has its corporate offices located at 9900 Bren Road East, Minnetonka, Minnesota 55343 in Hennepin County, City of Minnetonka and State of Minnesota.

28.    United HealthCare is a for-profit health care company that is the insurance arm of United Health Group and ranked fifth largest corporation in the United States of America by total revenue. It offers insurance services that are supposed to cover over 50 million patients.

29.    UnitedHealth employs in excess of two hundred and seventy- thousand employees.

30.    At all times relevant herein, United HealthCare's employees, Senior Medical Directors, Vice Presidents, Human Resource and Employee Relations personnel, managers, agents (and attorneys) and servants, specifically Kristin Schaad Nelson, who was Plaintiff's direct Supervisor and a Senior Medical Director, Employer & Individual (Commercial line of business), United HealthCare (**"Nelson"**); and Dr. Jeanette Velarde-Dunbar, Vice President for Employer & Individual (Commercial line of Business), United HealthCare, (**"Velarde"**) and, and Dr. Jody Helmick, Medical Director, Employer & Individual (Commercial line of Business), United HealthCare,  and more currently at Optum also owned by UnitedHealthGroup (**"Helmick"**) and Dr. Robert Kantor, Supervisor and Senior Medical Director, Employer & Individual (Commercial line of Business), United HealthCare, (**"Kantor"**); and Dr. Amin Hakim, Former Vice President for Employer & Individual (Commercial line of Business), United HealthCare, (**"Dr. Hakim"**);  and Dr. William O'Bryant, Senior Medical Director for Employer & Individual (Commercial line of Business), United HealthCare, (**"O'Bryant"**); and Dr. Matthew Shelley, former Vice President for Employer & Individual (Commercial line of Business), United HealthCare, (**"Shelley"**); and Mr. Fran Christy, Director, Employee Relations, Employer & Individual (Commercial line of Business), United HealthCare, (**"Mr. Christy"**) and, Ms. Celeste Utley, Employee Relations Case Manager, United Health Group, (**"Ms. Utley"**),

acted at the behest of United Health Care and United Health Group during the course and scope of their employment with United Health Care and United Health Group.

31.    At all times material to this action, the United Health Care and United Health Group was the plaintiff's "employer" within the meaning of Cal. Gov. Code 12940, ADA, EPA, FEHA and Los Angeles Civil and Human Rights Ordinance 18-0086.

32.    Defendants Nelson, Velarde, Helmick, Kantor, Shelley, O'Bryant, and Utley and Christy are all employees of United Health Care.  Defendant Hakim was an employee of United HealthCare.

33.    At all relevant times herein, Defendant Nelson was Halikman's supervisor, and in a position to harass and discriminate against Halikman in violation of Cal. Gov. Code 12940, ADA, EPA, FEHA and the Los Angeles Civil and Human Rights Ordinance 18-0086.

34.    At all relevant times herein, Defendant Nelson is an individual who aids, abets, incites, compels or coerces unlawful discriminatory treatment and/or retaliation in violation of Cal. Gov. Code 12940, the ADA, EPA, FEHA and the Los Angeles Civil and Human Rights Ordinance 18-0086.

35.    At all relevant times herein, Defendants Drs.Kantor, Velarde, Helmick, Shelley, O'Bryant, Hakim, Mr. Christy and Ms. Utley were in a position to harass and discriminate against Dr. Halikman in violation of Cal. Gov. Code 12940, and the ADA, EPA, FEHA and the Los Angeles Civil and Human Rights Ordinance 18-0086.

     a.    At all relevant times herein, Defendants Kantor, Velarde, Helmick, Shelley, O'Bryant, Hakim, Christy and Utley were individuals who aided, abetted, incited, compelled or coerced unlawful discriminatory treatment and/or retaliation in

14

violation of Cal. Gov. Code 12940, and ADA, EPA, FEHA, and the Los Angeles Civil and Human Rights Ordinance 18-0086.

FACTS COMMON TO ALL COUNTS[1]

The claims set forth herein arise from the following set of facts

BACKGROUND & DISABILITY

36.    From May 2013 through February 2018, Dr. Halikman was employed as a Regional Medical Director in the Commercial line of business (Employee and Individual) at the United HealthCare.

37.    During her employment with United HealthCare, Dr. Halikman suffered discrimination and retaliation based upon her physical disability.

38.    During her employment with United HealthCare, Dr. Halikman suffered discrimination and retaliation based upon her disability.

39.    During her employment with United HealthCare, Dr. Halikman suffered discrimination and retaliation based upon her religion.

40.    During her employment with United HealthCare, Dr. Halikman suffered discriminination and retaliation based upon her gender.

41.    During her employment with United HealthCare, Dr. Halikman suffered discriminination and retaliation based upon her partipating in protected activities;

42.    During her employment with United HealthCare, Dr. Halikman suffered discriminination and retaliation based upon her reporting of illegal activities by United

---

1. All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

HealthCare's Management that could impact millions of United HealthCare patients throughout the United States and based upon her participation in protected activities; and

43.    During her employment with UnitedHealthCare, Dr. Halikman suffered discrimination and retaliation in the form of slander.

44.    During her employment with UnitedHealthCare, Dr. Halikman suffered discrimination and retaliation in the form of libel.

45.    During her employment with UnitedHealthCare, Dr. Halikman suffered discrimination and retaliation in the form of defamation of character.

46.    During her employment with United HealthCare, Dr. Halikman suffered discrimination and retaliation in the form of wage theft and in the form of unequal pay.

47.    During and following her employment with United HealthCare, Dr. Halikman suffered violation of her HIPAA Privacy rights, and

48.    Dr. Helmick violated HIPAA Privacy Rules and violated Dr. Halikman's right to privacy in disclosing Dr. Halikman's PHI (Personal Health Information) without Dr. Halikman's knowledge and/or consent;

49.    Dr. Nelson violated HIPAA Privacy Rules and violated Dr. Halikman's right to privacy in disclosing Dr. Halikman's PHI (personal health information (PHI)) without Dr. Halikman's knowledge and/or consent; and

50.    Attorney Joanne Seltzer, a business partner of UnitedHealthcare, acting as their agent while in their employ, violated HIPAA Privacy Rules and Dr. Halikman's right to privacy of her personal health information by disseminating Dr. Halikman's PHI without Dr. Halikman's knowledge and/or consent;

51.    Dr. Nelson and Attorney Seltzer violated Dr. Halikman's right to privacy under HIPAA to threaten and intimidate her to drop a claim with a Federal Agency for their violations of United States Labor Laws regarding employment rights, discrimination and retaliation for Dr. Halikman's participating in protected acts;

52.    Dr. Halikman suffers from multiple disabilities known as Spinal Stenosis, hand/wrist/foot injuries, (GAD) Generalized Anxiety Disorder and Post Traumatic Stress Disorder (PTSD).

53.    Dr. Halikman functioned and continues to function at a very high level in spite of these disabilities.

54.    Independent audits of the work of Medical Directors showed Dr. Halikman's work accuracy for the last several months of her employment at UnitedHealthCare to be the highest in her group of peers, while maintaining high productivity as well putting her at the top of her peer group;

55.    Kristin Schaad Nelson and Attorney Seltzer had access to those Independent Audit results and thus knowingly lied to a Federal Agency when they reported to that Agency that Dr. Halikman's work product was poor;

56.    Spinal Stenosis is a problem affecting the spinal cord. Clinically, it can cause pain in the neck or mid or lower back.

57.    Common initial and chronic complaints of Spinal Stenosis include leg or arm weakness, balance problems, numbness in the legs, extreme pain in the legs or lower back pain while standing or walking.

58.    Dr. Halikman's disease, Spinal Stenosis, is exacerbated by certain postural positions. Sitting in a car significantly worsens her pain.

59.     A sit-to-stand desk may help improve alignment of the spine.

60.     Working from home at a telecommuting job prevents the leg pain from worsening.

61.     Dr. Nelson knowingly and with malicious intent eliminated Dr. Halikman's medical accommodation of a sit to stand desk on or about November 21, 2017 forcing Dr. Halikman to work without the appropriate medical accommodation; and

62.     Dr. Nelson knowingly and intentionally with malice, cruelty and inhumanity eliminated Dr. Halikman's medical accommodation of a sit to stand desk on or about November 21, 2017 forcing Dr. Halikman to work without the appropriate medical accommodation to intentionally cause her physical harm; and

63.     Dr. Nelson eliminated Plaintiff's telecommuting privileges on or about November 21, 2017 forcing Dr. Halikman to have to commute and sit in a car for more than two hours daily.

64.     Dr. Halikman had suffered multiple right foot injuries. Dr. Halikman had broken a bone in her right foot. Dr. Halikman's recent injury took place November 2017.

65.     Dr. Halikman informed Dr. Nelson, Dr. Robert Kantor and others of an injured right foot.

66.     Dr. Halikman also informed Dr. Nelson and Dr. Robert Kantor about her bad back.

67.     Triangular Fibrocartilage Complex (TFCC) Tear is a problem affecting the wrist. Dr. Halikman suffers from an injury to her right wrist of her dominant hand.  TFCC is often associated with a wrist fracture. Dr. Halikman also suffers from an wrist fracture with associated

injuries to her right dominant hand. Clinically, this causes chronic pain and weakness in the dominant right wrist and in the hand.

68.    Common initial and chronic complaints of TFCC and wrist fracture include pain and weakness or inability to grip objects.

69.    Dr. Halikman's conditions of dominant right hand wrist fracture and TFCC, is exacerbated by carrying anything heavy. Dr. Halikman took a job telecommuting to avoid having to carry equipment into an office and then to and from that office; and

70.    An ergonomic wrist rest helps lessen the symptoms or prevent their worsening. Dr. Nelson knowingly eliminated this medical accommodation of an ergonomic wrist rest on or about November 21, 2017 and also eliminated Dr. Halikman's telecommuting privileges forcing Dr. Halikman to carry equipment to and from an office daily worsening her wrist pain and her hand pain.

71.    All of the above actions taken by Dr. Nelson were done in retaliation for Dr. Halikman's participating in a protected act.

72.    Dr. Halikman told Dr. Helmick that instructions given to all of United's Medical Directors by Medical Director Dr. Charles Harrison on the morning of November 21, 2017, regarding reconstructive surgery in Breast Cancer survivors, was a violation of the 1973 Federal Mandate protecting women who have had breast cancer.

73.    Dr. Charles Harrison's direct Supervisor is Dr. Jeanette Velarde-Dunbar of Albuquerque, New Mexico.

74.    Dr. Helmick worked alongside Dr. Nelson throughout the period in which Dr. Nelson harassed, threatened, intimidated and retaliated against Dr. Halikman.

75.    Dr. Nelson informed Dr. Halikman also on November 21, 2017, that she had received Dr. Halikman's letter  (dated November 15, 2017) in which Dr. Halikman cited Dr. Nelson's violation of Federal and State Laws with regard to URAC (Utilization Review Accreditation Commission), and Dr. Nelson told Dr. Halikman, "it (the letter) was a problem not just for Dr. Nelson, but for the entire Enterprise." Dr. Nelson made these comments in the presence of Dr. Robert Kantor. They were made in an intimidating and very threatening voice by Dr. Nelson.

76.    Following receipt of Dr. Halikman's November 15 letter, United management altered their telecommuting policy the very next day; and

77.    Following receipt of Dr. Halikman's November 15th letter, (in which Dr. Halikman cited Nelson's URAC violation), Dr. Nelson eliminated Dr. Halikman's telecommuting privileges. Dr. Nelson along with Dr. Robert Kantor did this to Dr. Halikman on November 21, 2017.

78.    Dr. Robert Kantor always acted in concert with Dr. Nelson and with full knowledge of Dr. Halikman's medical disabilities.

79.    Dr. Nelson forced Dr. Halikman to drive a car in L.A. rush hour traffic with an injured right foot, spinal stenosis and GAD.

80.    Dr. Nelson forced Dr. Halikman to leave her dying (pet) dog, alone in her home, with the intentional infliction of emotional distress, and

81.    Dr. Nelson knowingly forced Dr. Halikman to carry heavy equipment to and from an office with an injured right foot and with spinal stenosis; and

82.    Dr. Nelson did not make parking available for Dr. Halikman at the site.

83.    Dr. Halikman notified the office of Dr. Nelson's Supervisors, Drs. Shelley and Velarde, of being asked to commute by Dr. Nelson in spite of her medical problems (which is why she had taken a telecommuting position).

84.    Dr. Velarde as Dr. Nelson's direct Supervisor was or should have been very much aware of what Dr. Nelson was doing to retaliate against Dr. Halikman.

85.    Dr.Jeanette Velarde-Dunbar has a well-known pattern of harassing female Medical Directors by revoking their telecommuting privileges and forcing them to commute to ill-equipped offices as a way to terminate them through constructive discharge as she has done this before; and

86.    Dr. Robert Kantor was aware of and participated in many of Dr. Nelson's retaliatory actions against Dr. Halikman.

87.    Both Dr. Robert Kantor and Dr. Bill O'Bryant were aware that Dr. Halikman suffered from GAD and PTSD.

88.    Dr. Jody Helmick was also well aware that Dr. Halikman suffered from GAD and PTSD.

89.    On or around November 30, 2017, Dr. Nelson told Dr. Halikman that she had spoken with Dr. Jody Helmick about her at length, and that "Dr. Helmick had provided her with all sorts of personal information about Dr. Halikman." (INVASION OF PRIVACY, HIPAA VIOLATION)

90.    Dr. Robert Kantor (Minneapolis, Minnesota) and Dr. Jody Helmick (Adel, Iowa), both members of the medical profession, participated in discriminatory and retaliatory actions aimed at Dr. Halikman's disability to knowingly and eagerly exacerbate and worsen her condition. Both Dr. Kantor and Dr. Helmick worked closely with Dr. Nelson and were aware or

21

should have been aware of ALL of her actions against Dr. Halikman including those taken to directly inflict harm upon Dr. Halikman.

91.    Dr. Kantor and Dr. Helmick directly observed Dr. Nelson bullying Dr. Halikman and engaging in activities to exacerbate these medical conditions and do her harm. By doing nothing to stop Dr. Nelson's behavior, as such they were participants themselves in doing harm to Dr. Halikman.

92.    Dr. Robert Kantor violated the medical profession's Code of Ethics. Dr. Jody Helmick violated the medical profession's Code of Ethics. Dr. Kristin Schaad Nelson violated the medical profession's Code of Ethics. Dr. Jeanette Velarde-Dunbar violated the Medical Profession's Code of Ethics.

93.    Dr. Matthew Shelley was made aware of all of the discriminatory and retaliatory activities and how Dr. Nelson was harassing Dr. Halikman and causing her harm and did not take action to prevent these activities by Dr. Nelson nor provide relief in any manner to or for Dr. Halikman,

94.    Dr. Matthew Shelley was supposed to be the final word in ending the CAP against Dr. Halikman and providing her relief, but did nothing.

95.    Throughout the time that Dr. Matthew Shelley was reviewing Dr. Halikman's case and complaints against her Supervisor, Dr. Shelley failed to reveal information pertinent to himself and his ability to provide such review; and

96.    Mr. Fran Christy was aware of Dr. Nelson's actions towards Dr. Halikman. Mr. Christy works for Employee Relations. Mr. Fran Christy was made aware by Dr. Halikman on more than one occasion of the impact that Dr. Nelson's activities were having upon her. Mr. Christy did nothing to stop Dr. Nelson's harassment, discrimination and retaliatory actions

intended to harm Dr. Halikman. In this manner Employee Relations and Human Resources at United Healthcare colluded and conspired with Management to do harm to an Employee instead of providing relief for Employees.

97.     Dr. Nelson was aware of the foot injury and bad back when she ended Dr. Halikman's telecommuting privileges and told her she would have to commute. Dr. Nelson was aware that commuting would exacerbate a number of medical problems that Dr. Halikman suffered from but did so with maliciousness and in retaliation for Dr. Halikman participating in a protected act in reporting Nelson's violation of Federal and State Laws. (URAC VIOLATIONS)

98.     GAD is a generalized anxiety disorder. Post Traumatic Stress Disorder or PTSD develops after a person is exposed to a traumatic event.

99.     Dr. Halikman's GAD and PTSD were made fun of by Dr. Bill O'Bryant in a public format, also violating Dr. Halikman's Right to Privacy under HIPAA.

100.    Dr. Helmick was aware that Dr. Halikman had a medically prescribed service dog who passed away in 2016. Dr. Helmick was aware that Dr. Halikman left her home infrequently because of her disability. Dr. Helmick was also aware that this was the reason Dr. Halikman took the job as a telecommuter.

101.    Dr. Nelson was also aware that Dr. Halikman had a service animal for GAD in her home where she worked as a telecommuter.

102.    Dr. Nelson, Dr. Helmick and Dr. Kantor were all aware that Dr. Halikman also had a pet animal at home who was ill and dying and near the end of his life. They also knew that Dr. Halikman cares deeply for animals.

103.    Dr. Helmick, Dr. Kantor and Dr. Nelson knew that Dr. Halikman did not want to be separated from her pet dog and they knew that separating Dr. Halikman from him when he was ill and dying at the very end of his life would cause emotional distress.

104.    Dr. Helmick, Dr. Nelson and Dr. Kantor knew that Dr. Halikman had recently suffered the loss of her father.

105.    Dr. Nelson, Dr. Kantor and Dr. Helmick intentionally inflicted emotional distress on the Plaintiff by separating her from her dying pet dog in his final weeks and days of his life.

106.    When Dr. Nelson eliminated Dr. Halikman's telecommuter status, she knowingly sent Dr. Halikman to an office an hour's commute from her home that according to United's lease with them "did not allow any animals, including service animals."

107.    Dr. Nelson knew in advance of sending Dr. Halikman to this office, that this office did not allow "any animals";

108.    Dr. Nelson also knew of the physical arrangements of the office. Dr. Nelson was also aware of the terms of the lease arrangements with the building to which she was asking Dr. Halikman to commute several hours – with a bad back, an injured foot, a bad wrist, GAD, PTSD and a service animal.  Dr. Nelson did this intentionally to inflict harm upon Dr. Halikman.

109.    Dr. Helmick knew that Dr. Halikman's PTSD was a result of the violent death of one of her animals;

110.    Knowing all this, Dr. Nelson and Dr. Helmick's sought to separate Dr. Halikman from her dying pet dog during his final weeks and only weeks after the death of her father. They did this intentionally, with inhumanity, cruelty, malice of forethought and in retaliation for Dr. Halikman's reporting Dr. Nelson's illegal activities with regard to URAC. Dr. Nelson and Dr. Helmick did this with behavior unbecoming any member of the medical profession; and

111.    Dr. Helmick in particular was well aware that this pet animal could need acute care in his final weeks or days and that Dr. Halikman lived alone and would not be able to get him that care if his condition changed suddenly and warranted it while she was away at an on-site office. Dr. Helmick knew that if Dr. Halikman was out of her home for ten or more hours daily, there would be nobody to assist the pet (dog) if he became acutely ill. Dr. Helmick knew or should have known that this would exacerbate Dr. Halikman's GAD and make her ill. Dr. Helmick reported directly to Dr. Nelson. Dr. Helmick cruelly, inhumanely and with ruthless disregard for a fellow physician's well-being did this to Dr. Halikman and did it following the death of Dr. Halikman's father; and

112.    Dr. Helmick's actions were done intentionally, with malice of forethought, with inhumanity and with cruelty in order to advance her own career and secure a larger financial bonus for 2017. In short, she did this with behavior unbecoming a member of the medical profession; and

113.    Both Dr. Helmick and Dr. Nelson therefore knew that separating Dr. Halikman, an avid animal lover, from her own dying animal in his final weeks and days, would cause increasing anxiety and stress on her and exacerbate her GAD potentially causing her serious medical harm.

114.    Dr. Robert Kantor of Minnesota participated in all of the activities perpetrated by Dr. Kristin Schaad Nelson and did so knowingly, inhumanely, and with wanton cruelty towards Dr. Halikman, behavior that is unbecoming a member of the professional medical community. Dr. Kantor was very aware of Dr. Halikman's medical disability and as such he had a unique responsibility towards Dr. Halikman when he observed and allowed the harassment and abuse of her, saw its impact on Dr. Halikman, and yet remained silent and did nothing. Dr. Kantor knew

or should have known how the harassment and targeting of Dr. Halikman would impact her medical well-being and allowed it to continue while doing nothing to stop it. His behavior was disgraceful and especially shameful, and not fitting for any member of the medical professional community; and

115.    Dr. Jeanette Velarde was Dr. Nelson's Supervisor throughout the time that Dr. Nelson supervised Dr. Halikman. She therefore was aware or should have been aware of Dr. Kristin Schaad Nelson's actions including all those that were illegal, inhumane, and intentionally cruel. Dr. Jeanette Velarde has a long history of cruelty to other female medical directors, including separating a single mother from her young child in order to "teach her a lesson" for reporting Velarde's illegal activities with regard to Medicare patients. Dr. Jeanette Velarde-Dunbar's behavior is particularly despicable and unbecoming a member of the medical profession; and

116.    Dr. Jeanette Velarde has been personally responsible for and/or overseen similar or identical acts of cruelty to other female Medical Directors working for United Healthcare when they reported illegal activities of which she was aware and/or a party to; and

The claims set forth herein arise from the following set of facts

**BACKGROUND & RELIGION**

Sadly, United HealthCare has a long history of anti-semitism. It was well known in the Department that other Medical Directors were treated differently because of their Jewish religion.

117.     During her employment with United HealthCare, Dr.Halikman suffered

discrimination and retaliation based upon her religion.

118.     Dr. Halikman is of the Jewish religion.

119.     When Dr. Halikman's father passed away, she asked Dr. Nelson to allow her to

take the remainder of that day off.  Dr. Nelson refused Dr. Halikman's request.  She did

this to Dr. Halikman on the day that Dr. Halikman's father died.

120.     When Dr. Halikman asked for "Peer to peer call coverage" while in Mourning for

her father (a period referred to as "observing Shiva"),  Dr. Halikman was threatened with

loss of her job by Dr. Nelson who stated that making those phone calls was part of the

job, and asked Dr. Halikman if she could no longer do her job. Dr. Nelson did this to Dr.

Halikman on the morning that Dr. Halikman's father died.

121.     At no time did Dr. Nelson refer Dr. Halikman to H/R to arrange for special

religious accommodation. Dr. Nelson also did not bother to report Dr. Halikman's

request for a religious accommodation to H/R at the time of Dr. Halikman's request.

122.     Dr. Nelson lied to a Federal Agency when she stated that she provided religious

accommodation to Dr. Halikman and redirected Dr. Halikman's peer to peer calls while

Dr. Halkman was sitting Shiva – which Dr. Nelson additionally reported was a hardship

for the company to accommodate Dr. Halikman in this manner.  In fact, Dr.Nelson

continued to direct peer-to-peer calls to Dr. Halikman while she was observing Shiva, the period of mourning for Jewish individuals.

123.    Dr. Halikman requested to be able to leave work no later than sundown on Friday evenings. In spite of her requests, cases continued to be sent to Dr. Halikman late on Fridays, even though there were Team Members who did not observe the Jewish religion who could have covered those cases.

124.    Dr. O'Bryant berated Dr. Halikman for not completing cases that were sent to her AFTER sundown on Shabbat, while others on the Late Day team, none with similar religious beliefs, had all left early. Nobody on the Late Day Team at the time heard from Dr. O'Bryant about their leaving early on Friday nights.

125.    Dr. Halikman asked to leave one hour early to say Memorial Prayers for her father on the Jewish High Holy Days. Dr. Jody Helmick (Adel, Iowa) tried to prevent Dr. Halikman from leaving 60 minutes early. Other members of the West Coast Team routinely left early without asking to do so. But Dr. Helmick demanded to know if Dr. Halikman had cleared leaving 60 minutes early with Dr. Nelson. Dr. Helmick made no such demands or requests of the non-Jewish members of the Team. Nor did she make similar demands or requests of any of the male members of the Team who routinely left early without any courtesy notices to Teammates and without first checking with Dr. Nelson. Dr. Helmick continued to harass Dr. Halikman about leaving one hour early to say Memorial Prayers at Synagogue for her deceased dad.

126.    During her employment at United HealthCare, Dr. Halikman was told by a Senior Medical Director at United that peer to peer calls could be a problem for her "because

many people find the 'New York Jew' way of speaking to be particularly offensive." No

action was taken by United HelathCare.

BACKGROUND &

GENDER

During her employment with United HealthCare, Dr. Halikman suffered discriminination and

retaliation based upon her gender.

127.    Dr. Halikman was not offered certain stock options that were only made available

to male members of her Team. Other women on Dr. Halikman's Team were also not

offered these special stock options.

128.    Dr. Halikman and other female medical directors routinely worked longer and

later hours than male members of her same Team. Women were routinely overworked

and harassed while male members of the Team would leave work hours early with

impunity.  The differential treatment of male and female Medical Directors at United in

the Commercial line of business is well known among members of the Team.

129.    In addition to not being offered certain stock options, male members of the Team

were routinely and on the average given higher Bonuses, even when female members of

the Team worked longer hours and did more work.

130.    Dr. Halikman was cited for "lack of emotional intelligence," by Dr. Kristin

Nelson. Other female members of Dr. Nelson's Team also received citations for "Lack of

Emotional Intelligence," but no male members of the Team were told that they "lacked

emotional intelligence." This was used in part by Dr. Nelson to give lower annual reviews, which in turn impacted Bonuses and raises.

## SLANDER

131.     Dr. Nelson slandered Dr. Halikman to multiple Medical Directors, both in and outside of our Department at United HealthCare. On or around February 2018, Dr. Halikman was advised by a Medical Director in a different department that Dr. Nelson had been reaching out to other Medical Directors asking leading questions about Dr. Halikman. One Medical Director in a different Department at United told Dr. Halikman that Dr. Nelson did so, "in an attempt to get us to say something bad about you" all while making slanderous comments about Dr. Halikman.

132.     Dr. Halikman believes that Dr. Nelson's words may have also directly impacted her relationship with others on her Team or with whom Dr. Halikman worked.

133.     Dr. Nelson slandered Dr. Halikman  in conversations with other Medical Directors and Business partners of United.

134.     Dr. Jody Helmick slandered Dr. Halikman following Dr. Halikman's departure from United HealthCare.

## LIBEL

135.     Dr. Nelson libeled Dr. Halikman in her response to an EEOC complaint. She also libeled Dr. Halikman in comments made in Dr. Halikman's annual review, which did not directly address Dr. Halikman's work product but instead were a personal assault and full-on character assassination of Dr. Halikman.

**WAGE THEFT**

136.      Dr. Nelson and other Seniors took away Dr. Halikman's paid annual Holidays and

did not compensate her in any manner for the lost days, as they had for others by giving

them a different day off.

137.      Dr. William (Bill) O'Bryant entered Dr. Halikman's Time Sheet without her

knowledge or consent to make an entry while using and under her name, taking away

PTO time (Paid time Off) hours, for Martin Luther King Jr. , a national paid Holiday to

which others on the Team did not have to pay for with PTO.  Dr. Halikman learned of

this and when asked, Dr. O'Bryant claimed it was done in error and returned the PTO

hours to Dr. Halikman.

138.      Because of the above, Dr. Halikman called Payroll several times and would ask

them to double check her PTO balance for any errors and if there were any, she asked

that they correct them; and

139.      Dr. Nelson did not pay Dr. Halikman her earned, non-discretionary Bonus for

2017 which was based on a number of very specific parameters.  The Bonuses are paid in

February the year following the year in which they are earned.

140.      During the year in question (2017), Dr. Halikman's productivity was 5/5, and by

independent audits, the quality of Dr. Halikman's work in Nov and Dec 2017 as well as

the entire first quarter of 2018, Jan 2018, Feb 2018, was "100% Accuracy." Based on the

percentage that "Productivity" and "Quality" contribute to the calculation of the Bonus,

that would not equate to a "zero bonus." This wage theft of earned pay for which the

Plaintiff worked very hard throughout 2017, sometimes starting work at 4-5 AM and

working until 10-12 midnight five days a week, would have amounted to tens of

thousands of dollars.

141.    Male members of the Team with shorter hours, lower productivity and lower

accuracy were all given bonuses for 2017.

142.    Dr. Jody Helmick who contributed to the harassment, retaliatory and

discriminatory actions of Dr. Nelson, reportedly received a Bonus from Nelson

disproportionately higher than others at her same level within the company for her

assistance in harassing, damaging and hurting Dr. Halikman, a fellow physician.

143.    United HealthCare has a pattern of attempting to terminate Employees prior to the

February pay out date for the prior year's Bonuses.  They do this apparently in order to

avoid having to pay Bonuses, since they state that if you leave prior to the Bonus being

paid, they do not have to pay it, even though you earned it in the previous year and

worked all the days of that prior year and even though the Bonus has metrics and is non-

discretionary.

144.    United Senior Management has stated that Medical Director bonuses are not

"discretionary," and all of the Senior Medical Directors and Vice Presidents are aware of

this fact when they intentionally withheld Plaintiff's earned non-discretionary Bonus for

work year 2017.

145.    United may have been planning to terminate Plaintiff intentionally prior to the pay

out date of the Bonus, in order to avoid having to pay her her earned non-discretionary

bonus, as they terminated her access at 9:02 PM on the evening of February 15, 2018

when she left work for a medical appointment.

## DEFAMATION OF CHARACTER

146.     On or around February 2018, a member of United's offshore Southeast Asia
Team close to Dr. Velarde sent an e-mail to Drs. Kantor, Velarde and Nelson making
false statements regarding Dr. Halikman's work product; and

147.     He stated that a required peer to peer call had not been made by Dr. Halikman
when in fact it had been made; and

148.     Drs. Velarde, Kantor and Nelson knew or ought to have known that those
statements were entirely false and could have easily verified their inaccuracy by looking
at the work product. Instead, they colluded and conspired to perpetuate those falsehoods
with the intent to cause Dr. Halikman harm professionally and defame her.


### DR. HALIKMAN JOINS UNITED HEALTHCARE

149.     From 2008 to April 2013, prior to being hired by United HealthCare, Dr.
Halikman was the Senior Medical Director of Quality Assurance and Director of
Physician/Nurse/Reviewer Training at Advanced Medical Reviews ("*AMR*") in a well-salaried
position. Dr. Halikman enjoyed her work at AMR very much; and

150.     Dr. Halikman was actively recruited by United HealthCare to join their Team
because of her known expertise in evidence-based medicine and quality of care and review work.
Further she was needed because of both her State Licensure in California, her background on the
surgical and non-medical side of medicine, and her specialty of ophthalmology. She was told she
would be doing the same type of work she was already doing, just for a larger organization. She

was promised a full-time telecommuting only position. She was assigned to work in UM Prior

Authorization in the Commercial line of business; and

151.    In addition to the standard job duties, which she shared with her colleagues in the

Prior Auth Department, Dr. Halikman was routinely asked to participate in a number of other

activities on behalf of United HealthCare. These activities took time out of Dr. Halikman's case

work schedule and early in her tenure at United interfered with productivity. Her Supervisors

were aware of these other activities and wanted them to be done on behalf of United HealthCare.

152.    Dr. Halikman was one of the largest contributors of referrals to United's Fraud,

Waste and Abuse Department; and

153.    Dr. Halikman's name was mentioned in a Supervisory Meeting as one of the top

referral sources for fraud waste and abuse with a very high "conversion rate" of referrals actually

turning into investigations for illegal fraudulent activities, resulting in large recoupement of

money by United HealthCare;

154.    Dr. Halikman was never compensated for any of this work she did outside of her

own job description for fraud, waste and abuse; and

155.    Dr. Halikman was regularly contacted by members throughout the 270,000

employee organization to answer questions pertaining to disease of the eye. These "off the cuff"

consults both inside and outside of her Department, took time away from Dr. Halikman's own

case work; and

156.    Dr. Halikman was told that these consults were an expected part of her job; and

157.    Dr. Halikman was asked to assist the Medical Policy Committee in revisions of

certain policies regarding ophthalmological procedures; Dr. Halikman was told that this was an

expected part of her job. This took time away from Dr. Halikman's own case work; and

158.    Dr. Halikman was simultaneously told to focus on her own cases and told to "get your numbers up," and

159.    Dr. Halikman was asked and expected to give input on all areas of the eye, including those areas which she told Dr. Robert Kantor were "sub-specialties" within ophthalmology and therefore outside her area of expertise; this took time away from her own case work; and

160.    Dr. Halikman was asked and expected to take part in the Physician/Provider review panel. This required both review of medical records and participation in hearings. This took time away from Dr. Halikman's own case work.  Dr. Halikman was told that this was an expected part of her job. Dr. Halikman was however also told to "get your own case numbers up," and

161.    Dr. Halikman was asked by members of various Departments for her opinion on eye cases. This included the Appeals Department, Medicare Department, and Medicaid Department as well as other departments. These activities were required/expected of her by her Senior Medical Directors even though they were in addition to her own job and interfered regularly with her job and case work; and

162.    Dr. Halikman was told to "manage" these interruptions and "focus on her own job and getting your numbers up" , and

163.    Dr. Halikman was asked to assist with Physician and Nursing Education and training, prepare slides, prepare lectures, give the lectures (to multiple different audiences at different times) multiple times each year, while simultaneously being told to focus on her own case work and "get your numbers up", and

164.    In addition, Dr. Halikman helped to develop templates, which she happily shared with members of her Team when asked to do so, including Dr. Jody Helmick who was put in charge of and was supposed to be developing templates herself and not asking others to do her work for her; and

165.    Dr. Halikman served as a Subject Matter Expert (SME) for ophthalmology, where she was asked by other members of her Team to help them with their "eye cases" and their other "non-eye surgery cases" which she did but which interfered with Dr. Halikman's own case work; and she did this while also being told by her Supervisors to "get your own case numbers up," and

166.    Some of the members of Dr. Halikman's Team would interrupt her work multiple times a day asking Dr. Halikman if she could either do their work for them or walk through the cases step by step showing them how to do their work even though the Supervisors who trained Dr. Halikman also trained her Teammates. This interfered with Dr. Halikman's own work and her Supervisors' orders to "get your own numbers up," and

167.    Dr. Halikman was made Primary and Lead for Bariatric Surgery, due to her accuracy in following United's own policies when told to do so; and

168.    Dr. Halikman was Primary and Lead for Ophthalmology cases,

169.    Dr. Halikman was the chief consultant or "SME" (Subject Matter Expert) for ophthalmology for the entire 270, 000 enterprise; and

170.    Dr. Halikman was made Primary and Lead for the State of Colorado, and

171.    Dr. Halikman was made primary for the State of California and

172.    Dr. Halikman contributed multiple ideas on Innovation Day – including the Smart Patient App to help patients navigate the complicated healthcare environment to obtain the best care possible;

36

173.    Dr. Halikman's Smart Patient App idea was stolen and renamed by United HealthCare and Dr. Halikman was never compensated for her work on the Smart Patient App; and

174.    Dr. Halikman did all of these additional activities at the request of her Supervisors at United HealthCare, none of which she was ever compensated for by United HealthCare. At the same time, Dr. Halikman's Supervisors demanded that she "get her numbers up" and "stop all of the interruptions which are preventing you from doing that."

## DISCLOSURE OF DISABILITY AND PROMISES OF REASONABLE ACCOMMODATION

175.    While Dr. Halikman was serving as Senior Medical Director of Quality at AMR, she was approached by United HealthCare, who asked her to consider accepting a full-time position at United in their Commercial line of business Department.

176.    At that time, because of her disabilities, Dr. Halikman informed the recruiter that she would not accept any position that was not a full-time telecommuting position. Because the job was a strictly telecommuting job, no additional disclosures of a personal nature were made. She was told that the job strictly involved telecommuting and did not involve going into any offices.   The offer for a "telecommuting only" job was as advertised on United's website at that time and the same as all of the other Medical Directors in her Department.

177.    In response to the statement that this was a "full time Telecommuting Only" job, Dr. Halikman accepted the position that was offered to her. She was asked at the start of her job if she needed an ergonomic wrist rest and stated that she did. When her spinal

stenosis worsened, she submitted a written request for a medical accommodation, and it too was granted.

## DR HALIKMAN ACCEPTED THE JOB OFFER AT UNITED HEALTHCARE & QUIT HER JOB AT ADVANCED MEDICAL REVIEWS (AMR)

178. Based upon promises made by United's recruiter, that the job was a full time "telecommuting only" position, representations and assurances upon which Dr. Halikman reasonably relied to her detriment, she quit her position at A.M.R. and accepted United's offer and went to work for United HealthCare.

## A WRITTEN STATEMENT ACKNOWLEDGING THE MEDICAL ACCOMMODATION WAS SENT TO DR HALIKMAN

179. Employee Relations (TAM) memorialized in writing the medical accommodation of Dr. Halikman's disability.

180. On or around May 2013 Dr. Halikman was told that there is a very steep learning curve to this job, and

181. On or around May 2013 Dr. Halikman was told that it takes about 18 to 24 months to develop an "repertoire of templates" to refer back to when new cases come in. Dr. Halikman was told that this "data bank of old case "templates"" would help to "get her speed up" when working on cases.

182. On or around January 2014, shortly after Dr. Halikman started work at United, Dr. Don Stepita in the Appeals Department asked for her input on an eye case. Dr.

38

Halikman was never informed by Dr. Robert Kantor who had trained her, not to interact with the Appeals Department. In fact, the opposite is true. Since most specialists are in the Appeals Department, United Senior Medical Directors frequently direct the Medical Directors in Prior Authorization Department to seek their input on cases outside of their area of expertise. They are instructed to "note in the case that you obtained a consult in the correct field, but leave the name of the Consultant out of your note." **(URAC VIOLATION)**

183.    On or about 2014, the above instructions were memorialized in writing, **(URAC VIOLATION)** and

**184.**    On or around February 2014, Dr. Halikman's Senior Medical Director told Dr. Halikman that she was "trying to figure out why you are not able to do more cases." The Supervisor stated, "I think you have obsessive compulsive disorder and that must be why you don't do more cases! Has anyone ever told you that you have Obsessive Compulsive Disorder?" **(DISCRIMINATION DISABILITY)**

185.    On or about February 2014, Dr. Halikman informed her Supervisor/ Senior Medical Director that she was trying to learn her new job and that the Supervisor's comments were "not only not helpful, they were highly offensive."

186.    On or about February 2014, Dr. Halikman also suggested to her Supervisor that a Supervisor should not be making psychiatric diagnoses on co-workers without the appropriate medical specialty training, because it is not appropriate as a job supervisor to be providing medical assessments of their direct reports and because in so doing the Supervisor was practicing medicine outside of her specialty without the appropriate training or expertise; and

187.    On or about Feb 2014, Dr. Halikman told her Supervisor that she does not have
O.C.D., but did have increased anxiety from the Supervisor's micromanaging her. She
told her Supervisor, that she was interfering with Dr. Halikman's ability to do the job,
harming her, and that she'd appreciate the Supervisor's allowing her to do her job
without any interruptions such as chiding her to "do more cases and get your numbers
up," and

188.    On or about 2014 Dr. Halikman learned that other Medical Directors were being
similarly pressured to work faster and faster and post higher case review numbers, and
one Medical Director told his Supervisor, "I am not Charlton Heston tied to an oar;" and

189.    On or about this time, one of Dr. Halikman's colleagues, exhausted and tired,
burst into tears in a Team meeting stating, **"I can not work any faster;"**

190.    On or about February 2014 Dr. Halikman was working with sub-standard
equipment including an improperly functioning rebuilt laptop; and

191.    On or about February 2014 Dr. Halikman's annual review gave her average
scores overall but very high scores in Integrity and Ethics, high scores in compassion and
high scores in relationships with others. Dr. Halikman was acknowledged for her always
helping others. Dr. Halikman's "average scores" were in productivity and efficiency and
use of the rebuilt equipment.

192.    On or around 2014, Dr. Halikman notified Dr. Robert Kantor about an eye case
which required additional attention. A provider was attempting to get Dr. Halikman to
change a determination and she would not do it. (URAC VIOLATION)

193.     On or around 2014, Dr. Robert Kantor, Dr. Gail Wilder, Dr. Dick Justman and United HealthCare's attorney, Ms. Tracey Galinson, all participated in a **URAC violation** by altering Dr. Halikman's determination in an eye case. (**URAC VIOLATION**)

194.     On or around 2014, Dr. Anne Cramer in the Appeals Department informed Dr. Halikman that Dr. Halikman's decision in the aforementioned review had been "accurate and was consistent with both United Policy and FDA Guidelines," but that the aforementioned individuals (Dr. Kantor, Dr. Wilder, Dr. Justman and Attorney Tracey Galinson) had "rewritten the determination and made Dr. Cramer submit what they had written for her ." (**URAC VIOLATION**)

195.     On or around May 2014, Dr. Jody Helmick asked Dr. Halikman to switch on-call with her so that she could go to Colorado with her husband on a vacation. Nobody else would cover for Dr. Helmick. Dr. Halikman agreed to help out Dr. Jody Helmick.

196.     On or around 2014, Dr. Halikman's Supervisor was having problems with the VP of the E&I Department, Dr. Amin Hakim, who had had multiple formal complaints against him from women throughout our department. United had ignored all of those complaints and continued to do so for several years; and

197.     On or around 2014, Dr. Halikman's Supervisor started inexplicably yelling at her in a one-on-one meeting. Dr. Halikman was asked "**where is your accent from?**" and at several points during the conversation her Supervisor punctuated comments with the word, **"oi."**

198.     On or around 2014 Dr. Halikman's Supervisor told her that **"making peer to peer calls may be a problem for you because most people find your New York Jewish accent offensive,"**

199.     The above meeting impacted Dr. Halikman's health and well-being.  This was Dr.
Halikman's first experience with United's "Culture of Abuse" well known among the
medical directors in her Department, Commercial line of business, Employment and
Individual (E & I) health plans.

200.     On or around June 2014, Dr. Halikman submit an innovation idea to Marcy for
cost savings that might actually improve patient care; and

201.     On or around July 2014 Dr. Halikman's Supervisor invaded her privacy by
demanding details of what she was planning to do on her requested "time off," but
refused to grant PTO, and

202.     On or around 2014, Dr. Halikman's Supervisor calls her a "**squiggly line**" and
states that "**everyone else is a straight line**," the meaning of which she makes clear is
"not good," and

203.     On or around 2014 Dr. Halikman contacted Employee Relations H/R about
religious discrimination and disability discrimination at United as well as abusive
behavior and reported her Manager for comments made about "O.C.D." and her
Supervisor's anti-semitic slurs by repeated use of the phrase "**oi**" when speaking with Dr.
Halikman.

204.     On or about this time Dr. Halikman learns from Dr. Sam Wilmit, another Medical
Director, that he has had similar anti-semitic comments made to him by his Supervisors
and Senior Medical Directors at United HealthCare; and

205.     On or about this time, Dr. Halikman learns from another Medical Director that the
Seniors believe her to be Jewish and have been abusing and harassing her as well;  and

206.      On or about this time Dr. Halikman was told by another Medical Director: "**Keep your mouth shut and your head down- It is the only way to survive at United**" and he warns Dr. Halikman about the **"hostile and abusive culture at United,"** and he particularly points out Dr. Robert Kantor; and

207.      On or about this time, Dr. Halikman was told by a teammate that her then Supervisor had shared her productivity scores and feelings about Dr. Halikman's work product with him, invading Dr. Halikman's right to privacy;  and

208.      On or about this time, Dr. Halikman sought relief from H/R for religious and disability discrimination, but H/R did not take a report and did not follow up with Dr. Halikman, and

209.      On or around September 2014 Dr. Robert Kantor and a Senior Clinical Program Manager at United approach Dr. Halikman about their plan to have the non-MDs provide certain eye services (normally not even provided by general ophthalmology but rather by cornea specialists). Dr. Halikman explained that it would be malpractice for non-ophthalmologists to provide this care and would put patients all over the United States at serious risk.  Dr. Halikman stated that she could not put her name on that or sign off on it, and

210.      On or around 2014, an Appeals Medical Director writes United's Vice President Dr. Matthew Shelley to alter a denial on a case (for a relative of a friend). The case is being "escalated" up to Steve Helmsley according to this Medical Director. United VP, Dr. Matthew Shelley forwards the note to Senior Dr. Robert Kantor and to Dr. Halikman who had worked on the case. Dr. Kantor instructs Dr. Halikman to approve the case.  Dr. Halikman hesitates and explains to Dr. Kantor why she felt her decision was accurate

with regard to the Policy. Dr. Halikman does not want to alter her decision. But Dr.
Robert Kantor instructs Dr. Halikman a second time to approve the case. So Dr.
Halikman asked Dr. Robert Kantor, **"is this how I should now apply the policy to all**
**patients (treating them all the same way),"** and he answers, **"No. Our Policy wont'**
**change, and you should continue to apply it in the future the way you always have."**

The Appeals Medical Director committed a URAC VIOLATION.

Dr. Matthew Shelley committed a URAC VIOLATION.

Dr. Robert Kantor, Senior Medical Director and now Chief Medical Officer for
Minnesota plan, committed a URAC VIOLATION & DEPARTMENT OF INSURANCE
VIOLATION and

211.    On or around October 2014 all of United's Medical Directors get a lecture on how
to adjudicate cases involving Durable Medical Equipment (D.M.E.) from the person they
are told is the "S.M.E., " Subject Matter Expert for DME, Mr. Jack Sanders.

212.    On or around 2017, Dr. Halikman learns that Jack Sanders is actually not a
physician and also not a prosthetist. On or around this time Dr. Halikman hears from
colleagues that Jack Sanders is a real estate broker in Kona, Hawaii, advising over 200
Medical Directors at United which of the following to deny:  wheelchairs, prosthetic
limbs, insulin pumps, CPAP machines, Glucose monitors, special beds, TENS units, to
name a few, etc.

213.    On or around 2017 Dr. Halikman learns that Sanders gave deposition in Hawaii
District Court in which his background was given as part of the record, and that therefore
Department heads at United, including Dr. Jeanette Velarde and Dr. Matthew Shelley,
knew that they were using a non-prosthetist without the requisite training or experience to

advise Medical Directors across the Enterprise on denial of care to United's members

numbering in the millions; and

214.    On or around the end of 2014, Dr. Halikman's Teammates in E&I are all

encouraged to report to Management their feelings about the job, about their managers,

and Dr. Halikman includes information about the religious and disability discrimination

she had experienced. The surveys were not anonymous, yet there is no direct or indirect

response to Dr. Halikman's comments;  and

215.    On or around the Holidays 2014, Dr. Halikman is on call for one of the "Paid

National Holidays," but is not given a "compensatory day off," and

216.    On or around December 2014, Dr. Robert Kantor asks Dr. Halikman to cover for

another Medical Director over Christmas.  Dr. Halikman agrees but is not granted a

'compensatory day off' by Dr. Robert Kantor. Dr. Halikman will just have one less

National Paid Holiday off in 2014 than her 70-80 colleagues in her Department with the

same job description,  (**WAGE THEFT)** and

217.    On or around early 2015, Dr. Halikman is told she will be the primary or lead on

all Bariatric cases for the entire Department, based on the good job she was doing, and

218.    On or around January 1, 2015, Dr. Halikman is on call during a company paid

National Holiday (there are 8 annually and there are 70-80 members of her Team) and

she is not given a compensatory day off, and

219.    On or around February 2015, Dr. Halikman is asked by a colleague to do

additional work and prepare an educational program to be distributed across the

company, and

220.    On or around February 2015 she learns that the medical director's senior had assigned HIM this task and he in turn assigned it to her to have one of the women do the work for him; and

221.    On or around February 2015, Dr. Halikman makes an affordability suggestion that United hire more prosthetists to do the labor intensive D.M.E. cases more quickly than "M.D.-non-prosthetists" can do them, because of familiarity with prostheses and wheelchairs WC, but the idea never gains traction and Dr. Halikman does not understand the real reasons why, and

222.    On or around 2015, Dr. Halikman notifies a Senior Medical Director in advance of a Late Day Team meeting, that she can not stay late on Friday evening because of Shabbat; but will stay late every other day of the week; and that all others on the Late Day Team were leaving early every day of the week; and that none of the others on the Late Day Team are Jewish; and

223.    On or around May 6, 2015, Ralph Harmin at United sends an email to hundreds of Medical Directors notifying them that their allowance for Continuing Medical Education "C.M.E.," which was a contractual obligation United had to all of its Medical Directors and a requirement to maintain medical licensure and a cost of doing business, will no longer be reimbursed by United at the contracted agreement rate of $ 2,500.00 annually. He reports a nearly 90% cut in educational training of United's Medical Directors in violation of their work agreement contracts, and

224.    On or around July 1, 2015, Dr. Halikman is told by Dr. Robert Kantor to cancel her <u>already approved</u> planned days off in July to accommodate other members of the Team and their plans, revoking her planned PTO, and

46

225.    On or around September 2015 in a non-confidential "Survey" Dr. Halikman reports URAC violations, misuse of "Reasonable and Customary" (for members who seek out-of-network physician services), unhealthy working conditions, and failure of United's Medical Policies to accurately reflect the current, published, peer-reviewed medical and scientific literature (also known as evidence based medicine); and

226.    On or around Sept 2015 Dr. Halikman is given an explicit directive by Dr. Robert Kantor to treat gastric sleeve surgeries differently depending on the health plan, and to ignore one particular requirement but only when dealing with certain health plans;

227.    On or around October 2015 flex schedules are green-lighted by Dr. Jeanette Velarde-Dunbar for certain Medical Directors to accommodate differing needs, but not for Dr. Halikman and not for Jewish Shabbat. Dr. Velarde is functioning as the Lead in UM Utilization Management, although colleagues are saying that she is NOT Board Certified, **(URAC violation)**; and

228.    On or around October 2015, Dr. Halikman is harangued by her Supervisor about going to get allergy shots making her fearful of taking the time to go get needed allergy shots; and

229.    On or around October 2015, Dr. Halikman begins experiencing chest pain at work, and

230.    On or around 2015, Dr. Halikman speaks with Dr. Jody Helmick and reports to her that **"She nearly got killed trying to get back from her allergy shot to do cases for United,"** and

231.    On or around September, Dr. Halikman is asked to cover over the Jewish High Holy Days, and

232.    On or around November Dr. Halikman's <u>already approved</u> three (3) annual
C.M.E. (Continuing Medical Education) days are revoked by Dr. Robert Kantor with no
more C.M.E. courses scheduled before the end of the year. Regarding C.M.E. time
revoked by Dr. Kantor she is told later by Dr. O'Bryant, **"if you don't use them you lose
them, that's the way it goes!," (TIME/WAGE THEFT)** and

233.    On or around the end of 2015, as the harassment continues and intensifies, Dr.
Halikman's chest pain worsens; and

234.    On or around early 2016, United starts telling medical directors about special
"Emotional Intelligence training" and many women are encourage to go through this
training, but not the men;  this is done to 47 medical directors (nearly all women); and

235.    On or about January 1, 2016, Dr. Halikman agrees to take on-call during one of
the 8 National Paid Holidays (for another Medical Director who suffered loss of her
home due to a fire), but Drs. Kantor and O'Bryant do not give Dr. Halikman a
compensatory day off, and

236.    On or about February 2016 Dr. Halikman is told by her Supervisor to take several
hours out of her work day to serve as a panelist in a Cause Termination Appeal Review
hearing and to review legal documents and medical records prior to the hearing, and Dr.
Halikman is simultaneously told by her Supervisor to "get your numbers up," and

237.    On or about February 2016 Dr. Halikman is asked to train another trainer's new
Medical Directors on how to do review work, and is told by her Supervisor "**You should
help out,**" but "**Your job is doing cases,**" and "**get your numbers up,**" and

238.    On or around February 2016, Dr. Halikman was instructed by my Senior Dr. Bill
O'Bryant to "**manage requests for your time, focus on your case work, and get your**

numbers up," and "**you need to learn how to just say 'NO'**" and "**put improving
your productivity at the top of your to-do list,**" and

239.       On or around February 2016, Dr. Halikman was contacted by a Medical Director
outside of her Department, asking, "Do you have time to review the entire medical record
of a member and give me your assessment if there are any potential issues that I would
need to investigate. Let me know and I will email you the entire medical record." And
"this probably won't take more than an hour or two." For the first time, Dr. Halikman
said "no." And as a result Dr. Halikman was cited by her Senior for "not being
cooperative, not helping others, and written up for this" at her end of year evaluation in
February 2017, and

**240.**       On or around February 2016, Vice President Dr. Amin Hakim and Dr. Lewis
Gregory (Senior Medical Director) chastised Dr. Halikman for "approving too many
bariatric surgery cases." Dr. Halikman responded by stating that she was following
United's Policies as written. **VIOLATION DOI**

241.       On or around February 2016 Dr. Halikman was working upwards of ten to
eighteen (10-18) hours daily aggravating her disability, and

242.       On February 25, 2016 Dr. Halikman submitted a request for a Sit-To-Stand Desk.

243.       On or around April 13, 2016, Dr. Halikman received a commendation from Dave
Wichmann at United for her "**Compassion in helping others**" and a "BRAVO"
recommendation from the head of the company for her **Teamwork.**

244.       On or around spring 2016 Dr. Halikman noticed something unusual with her
computer and sent an email asking if anyone else had seen something similar.

245.     On around the same day Dr. Halikman received a reply from her Supervisor Dr. Bill O'Bryant which he copied to all of the members of Dr. Halikman's Department (approximately 100) making fun of her GAD directly and humiliating her publicly about her disability; and

246.     On or about May 2016, Dr. Halikman notified Dr. O'Bryant about the unequal distribution of the case work in their Department and in particular for the State of Colorado. The two MALE medical directors who awee supposed to be serving as back-up for Dr. Halikman were doing no work and Senior Bill O'Bryant was made aware of it and did nothing; **GENDER DISCRIMINATION,** and

247.     On or about May 2016 Dr. Halikman received several messages from her then Senior Dr. Bill O'Bryant pressuring her to deny more cases for bariatric Surgery. **URAC VIOLATION.** Dr. Halikman does not comply, and

248.     On or around May 2016, Dr. Halikman lectures the Team on ophthalmology case reviews and her presentation is very well received. This extra work is not recognized at the end of the year as she is - for the first time - cited for not helping others, and

249.     On or around May 2016 Dr. Halikman receives several e-mails from Senior Dr. Bill O'Bryant regarding "same state licensure" in which he acknowledges that the MD in the same state is not actually reviewing the case but rather just "signing off" on it. On or around this time Dr. Halikman learns that doing Arizona cases without an Arizona Medical License is a felony in the State of Arizona. Dr. Halikman hears from Dr. Ellen Stewart, a Medical Director in her Department who has a law degree, that she has looked into this and she tells Dr. Halikman that, "it is a felony to do AZ cases without an AZ medical license." She also tells Dr. Halikman that another Medical Director/J.D.Stuart

Chesky has already brought this to the attention of Sam Ho, a Senior Executive at United

HealthCare.  Senior Executives at United are aware that their Medical Directors are being

asked to commit a felony.

**UHC ASKS MED DIRECTORS TO COMMIT A FELONY**

250.      On or around June 2016, Senior Medical Director Susan Bockenhouser from

N.Y.C. announces plans to transfer DME case preps (wheelchairs, Prosthetic limbs, etc.)

overseas to Manila in the Philippines.  Because of the processes involved, several

medical directors speak out at staff meeting on or around June 2016 citing possible

patient safety issues, HIPAA violation risk during the digital transfer of records out of the

United States, and DOI Department of Insurance issues impacting all 50 states and

violation of certain State Laws, and

251.      On or around June 2016, Dr. Lewis Gregory from South Carolina and Dr. William

O'Bryant,  and Dr. Amin Hakim query Dr. Halikman repeatedly about bariatric surgery

about her *"increasing approval of cases"* which she points out to them "**met all**

**applicable criteria for approval,**" and they state that they "**are trying to figure out**

**why bariatric cases are being approved."**  Dr. Halikman  feels pressured by Drs. Lewis

Gregory, Dr. William O'Bryant and Dr. Amin Hakim. **URAC VIOLATION,** and

252.      On or around the next day, cases are assigned to Dr. Halikman after 5PM that are

due the next day BEFORE work hours, creating more stress on someone with GAD.

These cases could have been assigned to the 70+ members of the East Coast and Mid-

West Teams and Dr. Halikman mentions this to her Supervisor, who does nothing to stop

it,  **(HARASSMENT, INTENTIONAL INFLICTION EMOTIONAL DISTRESS),**

and

253.     On or around Spring 2016, Dr. Halikman receives an email "Forwarded for immediate review" about a 'friend of C.E.O. Steve Helmsley." Mr. Helmsley's assistant asks, "I received an urgent Executive complaint. Please advise the reason for the denial and what is needed for an approval." **URAC VIOLATION,** and

254.     On or about July 2016 Dr. Halikman is told to prepare and present an Eye lecture to the Team, which she did, and

255.     On or around mid-2016, Dr. Halikman e-mailed Dr. O'Bryant that she was having problems with her legs from sitting so long with no breaks for over ten to twelve hours and that she needed to "call it a day." Dr. Halikman also notified him that she was being made to work on Shabbat. **RELIGIOUS DISCRIMINATION**

256.     On or around mid-2016 email from Dr. O'Bryant telling Dr. Halikman that her suggestions to improve nursing efficiencies while well-intentioned are disruptive. In a phone conversation about Dr. Halikman's ideas he tells her to keep her ideas to herself and to, **"SHUT UP! SHUT UP! SHUT UP!,"** and

257.     In late 2016, Dr. Halikman is looped in on an email in which it is suggested that Primary Care Physicians (PCP's) do fundus photography in an undilated eye to meet the requirement for an eye exam used in the HEDIS measures, and the email received by Dr. Halikman stated the following:

- It is suggested that an undilated exam is the same as a dilated exam to rule out diabetic retinopathy, and

- It is suggested that a non-dilated exam costs less because a reduced services modifier applied, and

- It is stated that in the past United encouraged and pushed for Primary Care Providers to buy ophthalmological equipment and that they (the PCP) do the eye exams so that United could document more diabetic eye exams for HEDIS improvement, and

- It was stated that that would be a way to boost HEDIS scores, and

- There was a discussion about getting extra STARS in the STAR ratings related to eye exams, and

- It is stated that instead of actually doing an examination, maybe United could just get a photograph taken and that would count the same as if the person were actually being examined, and

- It is stated that neither an ophthalmologist or an optometrist is needed to take a photo, and

- It was questioned as to whether anyone would actually read the photos and unsure WHO is reading the test, and

- Someone in Fraud Waste and Abuse weighed in on the email chain stating that "If HEDIS describes a dilated exam and a dilated exam was not being done, we have a big problem potentially with **misreporting HEDIS criteria."**
  **(HEDIS VIOLATION)**

- Senior Vice President Clinical Affordability and Medical Policy for United Clinical Services responded, "I thought, in past years when United HealthCare pushed this to PCP's, the photo could serve as the same as a dilated eye exam for HEDIS."

53

- At this point, Dr. Halikman was looped into the emails and asked for comment on allowing non-eye doctors (not optometrists, non-ophthalmologists) to diagnose and treat diabetic eye disease, to which she responded: "I think it may be setting a dangerous precedent because they are neither qualified to diagnose or to treat vitreo-retinal disease. They may over diagnose leading optometrists to treat things that are normal, or under-diagnose failing to refer things that ought to be referred not just to an ophthalmologist but to a retinal-trained specialist. Primary Care providers, family docs, etc. are not specifically trained to make complex ophthalmological diagnoses."

- Email from Fraud Department stating that since nobody is actually performing a traditional exam, United can also save on paying the $55 differential as noted from the RVU's and then included the CMS conversion factors for the 'Diabetic eye screening" **(MAJOR ** HEDIS VIOLATIONS**)**

258.    On or around August 2016 Dr. Robert Kantor advises that non-physicians (P.A.'s) are now handling cancer case reviews for Employer & Individual, including IMRT, Proton Beam, Oncology Chemotherapy cases. Oncologist Dr. Shamoon Ahmad will sign off, and

259.    On or around December, Dr. Ahmad tells Dr. Halikman to "just sign my name" without even looking at a case she asked him for input on,

260.    On or around August 2016, Sam Ho, Chief Medical Officer for United HealthCare, announces planned reductions in prior authorization of up to 36%.

261.    On or around the latter half of 2016, the on-call schedule was disseminated
showing Dr. Halikman covering one of the 8 national Paid Holidays again (New Years
Day). Dr. Halikman spoke with her Supervisor Dr. Bill O'Bryant about this and he told
her he would not change it.

262.    On or around the latter half of 2016, Dr. Halikman contacted H/R about inequality
of on-call assignments involving the 8 Annual Paid Holidays off.    Dr. Halikman
explained that she was again assigned 1/8 Annual National Holidays and not being
allowed an alternative day off.

**(WAGE THEFT)** Dr. Halikman is told to speak with Employee Relations about the
unfair inequitable treatment and wage theft in the form of uncompensated loss of paid
time off. Dr. Halikman does this and asks to remain anonymous due to fear of
retribution/ retaliation.

> **DR HALIKMAN RETALIATED AGAINST FOR RAISING THE
> ISSUE OF INEQUITABLE TEAM ASSIGNMENTS WITH
> UNITED'S H/R DEPT., & WAGE THEFT IN THE FORM OF NOT
> GETTING COMPENSATORY TIME OFF; HARASSING BY DR.
> O'BRYANT BEGINS; CULMINATES WITH POOR ANNUAL
> REVIEW**

263.    On or about October Dr. Halikman was asked by Dr. Amin Hakim to evaluate Dr.
O'Bryant. Dr. Halikman discusses this with friends because of the treatment she had
received as a woman, a Jew, and someone with disabilities -  his making fun of her
disabilities publically, the disregard for her religious beliefs when it came to Shabbat;
but she is advised to "tread carefully," and so she chose to write a nice review in spite of
how she truly felt about Dr. Bill O'Bryant's behavior towards her;  and

264.     On or about late 2016 Dr. Halikman was told by colleagues that one of the

Seniors stated that "the Seniors all think it was you who complained about the on-call not

being fairly distributed" and *were told to retaliate against Halikman and make her pay*

*for her complaint."*

265.     Late 2016 Dr. Halikman was again assigned on-call for January 1st, a national

paid Holiday for the remainder of her Teammates.  Dr. Halikman tells Dr. O'Bryant that

this is "**discrimination to give everyone doing the exact same job eight National Paid**

**Holidays off per year but only give me seven each year.**" He responded, **"I can't help**

**you with that**" and he would not allow Dr. Halikman to mark any PTO days as

"compensatory" to get those days back, and

266.     One Senior Medical Director broke ranks and reported to several direct reports

that the reason E&I Department did not get "compensatory days" back was "because the

Seniors were doing that intentionally to get more work out of them," and "somebody

blew that all up by going to H/R," and "They think it was Dr. Halikman," and

267.     On or around November 2016, Senior Dr. Bill O'Bryant asks Dr. Halikman

invasive questions about her personal health.  Dr. Halikman responds that his question is

a violation of her right to privacy regarding her personal health information or PHI.

268.     On or around December 2016 (the busiest time of the work year), Dr. O'Bryant

tells Dr. Halikman to stop what she is doing and respond to an email about a case with 29

items he would like her to systematically address.  This causes Dr. Halikman to work a

23-hour day to get her work done, and

269.     On or around December 2016 Dr. Halikman notifies Dr. Robert Kantor that

- Dr. O'Bryant is relentlessly badgering her, and

- She has a disability, GAD, and

- O'Bryant is severely impacting her health, and

- O'Bryant is impacting her productivity and efficiency, and

- O'Bryant told her to, "keep your ideas to yourself" and

- O'Bryant yelled at her for offering her ideas, telling her to: **SHUT UP!  SHUT UP!! SHUT UPPPP!!!"**

- O'Bryant's treatment becoming unbearable, and

- O'Bryant demoralizes and demeans Dr. Halikman, and

- Asked Kantor for "relief" and change back to his team, and

- No response from Kantor the entire day.

270.    On or around the next day, Dr. Halikman injured her foot running to her computer in response to a ping from O'Bryant at 5 o'clock in the morning,

271.    On or around December 2016, O'Bryant sends several multi-page emails harassing Dr. Halikman and telling her he will not stop until she 'Admits he is right and then he will stop," and

272.    On or around December 2016 Kantor is notified that Dr. Halikman is working 15-hour days without a break, and

- In addition to her job, Dr. Halikman is doing consultant work within the company which is taking a lot of her time, and

- That she is physically exhausted and

- That O'Bryant's "beating up on her" is also exhausting, and

57

- Dr. Halikman tells Kantor that "she would do better with a low key Supervisor because of GAD,"

- O'Bryant has been disrespectful, and

- O'Bryant's actions are, "**making her ill,**" and

- Dr. Halikman notified O'Bryant that he is making her ill, and

- No response from Kantor for several days, and

273.      Male Medical Directors pushing back on nursing for mis-treating them, receive no blow back from Seniors at United, and

274.      On or around December 2016, a male Medical Director announces in an email at 7:12 AM that he will be out of the office for most of the day and that he has completed his cases. He is gone the entire day unable to be reached but receives no complaints from the Seniors for taking PTO or lack of availability. (He is also given a hefty Bonus in February 2018 by Dr. Nelson in spite of lower Quality scores than Dr. Halikman's, and no additional work done outside of case reviews)

275.      On or about December 2016 I was threatened and intimidated for approving too many bariatric (weight loss surgery) cases, and

276.      On or about December 2016, Dr. Halikman's request for relief and change of Supervisor, is denied by Dr. Amin Hakim, VP United, and ignored by Dr. Robert Kantor, and

277.      United buys up ASC Ambulatory Surgery Centers all over the United States. Site of Service clauses are inserted into policies. On or around December 2016, nurses attempt "soft steerage" of a critically ill patient who needs surgery, out of the hospital

setting and towards the Ambulatory Surgery Cener instead.  Dr. Halikman approves it for

the hospital anyway, and

278.       On or around January 2017, feeling ill from work stress, Dr. Halikman explores

various treatment options, and

279.       On or around January 25, 2017, Dr. Bill O'Bryant enters Dr. Halikman's

TimeSheet and alters it without her knowledge, deducting 8 hours for Martin Luther King

Jrs Birthday from her alone for being off that day,  a National Paid Holiday, and

280.       Dr. Halikman reports the above wage theft to Payroll, to which O'Bryant

responds by accusing her of not deducting PTO (days which she very clearly marked

"compensatory work shift"). Dr. Halikman contacts Payroll and asks them to "Please do

me a favor and run through all of my PTO to be sure it is accurate." Dr. Halikman was

told by Payroll that all appeared correct to them.

281.       On or around January 2017, Dr. Bill O'Bryant announces that the "Call

assignment methodology will be revised to resolve Holiday and weekend Holiday call

imbalances," and that further, "they are going to compensate the lost paid national

holiday by giving a compensatory work shift day which will be retroactive" to a date

arbitrarily decided on jointly by the Seniors, to be just AFTER the last time Dr. Halikman

took on-call, and

282.       On or about January 25, 2017, United HealthCare Attorney Maryan Galli advises

hundreds of Medical Directors at United that "you are not required to have an Arizona

Medical License to do the peer to peer on these (Arizona) cases. If you get caught it's

only a misdemeanor but United would not be in trouble, you would be. You could be

charged with a misdemeanor. But you do not need to worry about that, we will defend
you."

283.      ON or about January 25, 2017, United's Debbie Fields stated to the same group of
Medical Directors, "Do not tell the Arizona doctor that you are not licensed in Arizona. I
don't think you should offer that you are not licensed in Arizona. That would be my
advice."

284.      On or about January 25, 2017, Senior Medical Director Robert Kantor of
Minnesota told the same group of Medical Directors that it was okay to do these cases.
When several Medical Directors aggressively pursued the topic, Dr. Kantor responded
telling them for now to just do them and added,   "The issues of 'are we required to have
an Arizona license' we can have another meeting for further follow-up on this – a little
rushed in discussing this but we have other meetings to get to." There was no follow-up
meeting and these cases continue to be assigned to non-AZ Medical Directors under Sr.
Dr. Robert Kantor's leadership, and

285.      On or around January 26, 2017, a male medical director is approved immediately
(within days) for his PTO time off on 2/17-2/20, dates which Dr. Halikman requested
years earlier. Dr. O'Bryant finally approves PTO for 2/17-2/20. He later forgets he
approved these dates and asks Dr. Halikman to a required overlapping Meeting, and

286.      On or around January 2017, Dr. Halikman is assigned cases due the next morning
at the end of the day on Shabbat. All non-Jewish members of the Late Day Team have
left early, and

287.      On or around January 2017, Dr. O'Bryant chastises Dr. Halikman for not staying
late on Shabbat to work cases or come in on Shabbat Saturday to work cases but says

nothing to any of the non-Jewish members of the Late Day Team who left early and before Dr. Halikman did on Friday, **(RELIGIOUS DISCRIMINATION),** and

288.      On or around January 2017, Dr. O'Bryant sends Dr. Halikman a series of harassing and threatening emails which upset Dr. Halikman significantly, **(RELIGIOUS DISCRIMINATION),** and

289.      On or around January 2017, Dr. Halikman responded to Dr. O'Bryant that she had begun work at 4AM on Friday and worked on Shabbat until 10:30PM at night on Shabbat. Dr. Halikman stated that this is her religious Holiday and she is not supposed to work after sundown on Friday.

**(RELIGIOUS DISCRIMINATION),** Dr. Halikman emphasized that she had worked 18½ hours on Friday and that she was not supposed to work on Friday night or Saturday. Dr. Halikman told him to "correct your problem for Late Day Coverage and stop blaming the one person who is working and doing their job and start focusing your attention instead on those who are either lazy or irresponsible or both and leaving early." **(RELIGIOUS DISCRIMINATION),** and

290.      On or around February 2017, Dr. Halikman discussed with Dr. Jody Helmick the fact that she was still receiving Arizona State cases and her discomfort knowing it's a felony. Dr. Halikman and Dr. Helmick discussed the illegality of what United was asking them to do with regard to the Arizona State Medical Reviews, and

291.      On or around February 2017 Dr. Halikman filed a case with H/R regarding that following her complaint about unequal Holiday on-call paid days off unequal, she became the object of harassment and retaliation for the case she had filed in September 2016 **(RETALIATION** for reporting wage theft and violation of the Equal Pay Act], and

292.     On or about February 2017, Dr. Halikman is again told that **"Dr. Amin Hakim is
intentionally targeting Halikman through O'Bryant"** and

293.     On or around February 2017 at 2:06 AM, after working for over 20 hours straight
without a break, Dr. Halikman sent an email documenting the continued abuse by Dr. Bill
O'Bryant.

294.     On or around February 2017, Dr. Jody Helmick pings Dr. Halikman telling her to
**"be careful driving, we do not want any accidents just because you are concerned
about cases!",** and

295.     On or around later that day Dr. Halikman tells Dr. Helmick I've done double the
number of required cases (50) having started work at 4AM, in order to take time for
physical therapy later in the afternoon. Dr. Halikman make her aware of the hostile work
environment and stated that **"because of the stress they (United) are putting me
through, I am going to have a heart attack,"** and

296.     On or around that date, Dr. Halikman speaks with an internal recruiter at United
regarding a job in a different Department. They are looking for "someone from Los
Angeles, Someone with UM experience, and someone in a Surgery Specialty." Dr.
Halikman sends in her resume since she is the only person internally who fits that exact
description and the person interviewing for that position reads her resume and contacts
her immediately.  They set up an interview for 2/23/2017, and

297.     On or around February 2017, Dr. O'Bryant requests to meet Dr. Halikman on a
day when she is out of the office on PTO.  He states "you can tell me about your prospect
for new opportunities when we meet," so he's aware she is interviewing for a different
job at United.

298.    On or around February 2017, O'Bryant gives Dr. Halikman her annual review. The review is lowered from all previous years, **(RETALIATION),** and

299.    On or around February 2017, Dr. Halikman learns of others in her Department who are being victimized, all of them women, and

300.    On or around February 2017, Dr. O'Bryant sends a Birthday greeting about Dr. Halikman to her entire Department, but it reads, "ALL HAIL TO THE QUEEN," (none of the male medical directors ever in her years at United received such a note), **(GENDER DISCRIMINATION & HARASSMENT),** and

301.    ON or around February 2017, Dr. Halikman gets a copy of a NAKED MAN cartoon being circulated by the male medical directors at United HealthCare **(SEXUAL & GENDER HARASSMENT),** and

302.    On or around February 2017 Dr. Halikman is told by a fellow Medical Director to keep her job at United "you must grovel" and "say you are right no matter what they say or do to you," and

303.    On or around February 2017 Dr. Halikman requests to be on the Air Ambulance Team. Only MEN are allowed on the team. They get extra Stock Options. Her request is denied. **(GENDER DISCRIMINATION),** and

304.    On or around February 2017 Dr. Robert Kantor instructed a group of United HealthCare Medical Directors without Arizona medical Licenses to do Arizona cases and then someone from Arizona "Will just give a quick sign off on it to cover you", and

305.    On or around late February 2017 Dr. Halikman began work at 2:40 AM and started answering consults for east coast colleagues at 3:09 AM west coast time.

306.     On or around February 2017, a member of Dr. Halikman's Team asks her to do 4 of her cases for her.  Dr. Halikman has to do another person's work too, out of fear that Dr. O'Bryant will damage her on her review for not being helpful.

307.     On or around February 2017, Dr. Halikman completes another 17-hour day of work with no breaks at United HealthCare and her legs are painful and swollen. She lets O'Bryant know this.

308.     On or around February 2017 Dr. Halikman files a case against Dr. O'Bryant with H/R for retaliation for her complaint about unequal on-call.

**309.**     On or around February 2017 her scheduled job interview in a different department is cancelled only hours before it is to take place and without explanation the day after her meeting with Dr. O'Bryant  **(RETALIATION)**

310.     On or about February 2017, Dr. Halikman began work at 3:51 AM and found cases being placed into her queue at 5:05 AM that were due at 7:55 AM before the start of the normal work day. These cases could have been assigned to an East Coast Medical Director making them due at 10:55 AM local EST time, but were instead given to Dr. Halikman in the middle of the night and marked due before she would be expected to start work. Medical Directors are penalized for late cases, so this worries Dr. Halikman; **(HARASSMENT & RETALIATION), and**

311.     On or around February 24, 2017 a Medical Director stated that "Drs. Hakim, Kantor and O'Bryant were going after Dr. Halikman because they had narrowed it down to who complained about not getting Holiday pay. They were retaliating for that complaint that was placed with H/R." Dr. Halikman also heard that "there was a shouting

match at a higher level and Senior Executive, Sam Ho, was asking a lot of questions," (**RETALIATION**) and

312.      In or around March 2017, senior executives lauding themselves for saving money by redirecting patients out of the hospitals and to the Ambulatory Surgery Centers. There is discussion of Site of Service codes. One medical director suggests that this is especially great news in light of the fact that one arm of United, OPTUM, is now buying up the ASC's. Dr. Lewis Gregory comments that this is an "interesting market analysis" of United's Site of Service Program and states that we can all feel proud for making American Healthcare more affordable for our members. Nurses are instructed to do a "re-direct" by what they call "soft steerage" trying to get doctors to do things that they would normally do in a hospital, in an ASC instead. This includes dangerous surgery involving the vasculature to the brain. **(Department Of Insurance, violations)**

313.      On or around March 2017, Dr. Ricardo Lopez quits. It is reported by some of Dr. Halikman's colleagues that "he is upset by what he sees the seniors doing to their direct reports under Management's direction," and

314.      On or around April 2017 a medical accommodation case. Dr. Halikman tries to find out if United will grant her a medical accommodation for limited seating and breaks built into schedule. She reports that her back pain is getting worse from not being allowed a break for a 17 to 23 hour day.

315.      On or around April, Dr. Halikman gets a replacement Service animal for her worsening disability. She is advised by her physician to **"get out of United, they are making you sick."**

316.     On or around April 2017 United grants a medical accommodation for a sit to
stand desk.    They do not formalize the request for breaks.    (**DISABILITY
DISCRIMINATION**)

317.     On or around April 2017 a female team member continues to demand large
amounts of Dr. Halikman's time to do her case load with or for her, and

318.     On or around April and May 2017, Dr. Halikman tells Dr. Jody Helmick again
that Arizona cases are continuing to be assigned to her and she will not do them because
it is a felony. Dr. Halikman also tells Helmick that being told to change a determination is
a URAC violation, and

319.     In May 2017 Dr. Halikman requested time off to see a dying parent, and

320.     On or around the end of May Dr. Halikman is still waiting for an approval for
time off to see her dying father, with a planned trip just four days away, and the cost of
last minute cross country airfare skyrocketing; and

321.     On or around late May 2017, Dr. Halikman meets with Dr. Velarde and Velarde
says, "I have the PERFECT Senior for you." Dr. Halikman also tells Velarde that she has
not gotten anyone to sign off on her time off to see her dying father, and

322.     On or around June 2017, Dr. Halikman's request for vacation time off in late May
2017 to see her dad was still not approved by Dr. Kristin Schaaad Nelson, and

323.     On or around June 13, 2017, Dr. Velarde tells Dr. Halikman's Team that "our # 1
priority is getting reviews right the first time." In spite of Dr. Halikman's perfect
accuracy on independent audits, Dr.Velarde signs off on giving Dr. Halikman a "Zero
Bonus" for 2017, and

324.    On or around June/July Dr. Halikman is assigned a new Medical Director, Dr. Kristin Schaad Nelson.

***325.***    On or around end of July Dr. Halikman's father is quite ill and she calls her back-up, Dr. Helmick, who in turn sends an email to Dr. Nelson and the peer to peer Team that Dr. Halikman's father is ill can we reassign her scheduled peer to peer calls (although there is only one).  It is unclear to Dr. Halikman why Helmick is sending emails when there is just one case that needs to be picked up and Dr. Helmick is Dr. Halikman's coverage (she is behind her alphabetically which is what determines coverage). Shortly thereafter Dr. Halikman receives a threatening call from Dr. Nelson telling her that, "***Peer to peers are part of your job and if you can't do them then Amy, then we need to have a conversation about that.***"

326.    On or around early August, an Optum Medical Director reaches out to Dr. Halikman regarding his wanting to figure out a way to "deny more of these anti-VEGF injections of Avastin, Eylea and other meds used in various retinal diseases. The tone of his call is worrisome, so Dr. Halikman explains to him that she is  not a retinal specialist and he should speak with someone who is specialized in retina whether or not his suggestions are or are not appropriate, and

327.    On or around August 2017 Dr. Halikman requested Family and Medical Leave with a start date of 8.03.2017.

328.    On or around August 2017 a replacement computer is sent after weeks of reporting a problem with hers,  and

329.    On or around August 4, Dr. Halikman returns home to visit with her dad. Dr.

Nelson did not approve the PTO until the 11th hour forcing her to spend thousands on

airfare and causing intentional infliction of emotional distress, and

330.    On or around August the FMLA team explained that had Dr. Halikman used PTO

time in lieu of FMLA she would have accrued PTO and that she lost already earned PTO

for 2 weeks of work by missing just the one Friday of pay period.    Dr. Halikman

questions the legality of withholding Earned PTO Time if you are out of the office on

only the Friday on which that earned PTO time is paid out. Dr. Halikman requested that

they make the changes and they did. (to use PTO and not FMLA time for the days out of

the office). Dr. Nelson cited Dr. Halikman for "PTO issues" in her annual MAP review

and this too Dr. Halikman was told impacted her Bonus, and

331.    On or around August 2017 Dr. Halikman was contacted and told her presence

would be needed to "throw a doctor off of the provider network" and "do it legally." Dr.

Halikman requested the case notes.  On review of the facts Dr. Halikman disagrees with

his termination and sends her opinion in writing to the Provider network Termination

Appeals Facilitator prior to flying home again, this time for her father's funeral.

332.    On or around August 14 Dr. Halikman was again asked to do Arizona cases,

which she was refusing to do. Dr. Robert Kantor's assistant got directly involved. Dr.

Halikman advised that MDs without an AZ medical license are not allowed to do this by

Arizona State Laws and that it is a felony. Dr. Halikman advises Kantor's assistant that

breaking the law puts the Medical Director's license at risk. Again everything is in

writing.

333.     August 2017, in the mourning, Dr. Halikman's father passes away and she received a phone call from her family. She asks Dr. Nelson for the remainder of the day off early in the morning after hearing the news. Dr. Kristin Schaad Nelson says, "***I'm sorry Amy, but you need to clean our your queue before you go anywhere unless you can get someone to take all of your cases. Please let me know if you are able to do that.***" Dr. Halikman was in shock and unable to get someone to take all of my cases, so she was forced to work until 5PM on the day that her father died.  **(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**

334.     Dr. Halikman called Dr. Nelson a second time to ask her for religious accommodation to sit Shiva. She denied this request too. Dr. Halikman explained that there is a conflict between the job requirement of p2p phone calls and her sincerely held religious beliefs and practices. Dr. Nelson never brought Dr. Halikman's request to H/R but just ignored it, denied it and buried it. **(RELIGIOUS DISCRIMINATION)**

335.     Dr. Nelson stated to Dr. Halikman on the day that Dr. Halikman's father died, "***If you do not do your peer to peers, which is part of your job, then I guess that means you don't want to do your job Amy. Is that what you are telling me Amy, that you can no longer do your job?***"

336.     On or around August 25, 2017, Dr. Halikman notified Dr. Jody Helmick that taking peer-to-peer calls while sitting Shiva was a problem for her. Dr. Halikman told Dr. Helmick that this was in direct conflict with her religious beliefs. Dr. Halikman was denied an exemption for doing peer to peers while sitting Shiva. **(RELIGIOUS DISCRIMINATION)** And

337.    On or around August 2017, Dr. Helmick asks Dr. Halikman for copies of all of the Templates Halikman developed while working for United that Halikman used to work cases, and

338.    On or around the end of August, the on-call schedule is distributed and Dr. Halikman is again on call while sitting Shiva and during the Jewish High Holy Days and while she is still in mourning for her father. **(RELIGIOUS DISCRIMINATION)**

339.    On or around August while Dr. Halikman was still in mourning, the end of year Holiday on-call schedule is also completed without her input, and

340.    On or around August while sitting Shiva, Dr. Halikman continues to have to field Peer to Peer calls while she is mourning. Nobody is supposed to telephone the home of someone in mourning, **(RELIGIOUS DISCRIMINATION)**, and

341.    On or around September 2017, Dr. Halikman still had not received any acknowledgement of her father's death from United HealthCare, which routinely sends such notices, flowers, to others on the Team who are not Jewish, when they lose a loved one including but not limited to their significant others, their dogs, etc., but they did not acknowledge Dr. Halikman's father's death, **(RELIGIOUS DISCRIMINATION)**, and

342.    ON or around 2017 another female Medical Director is charged with secretarial duties such as sending out Birthday Notices **(eg. GENDER DISCRIMINATION, pattern of behavior)**

343.    On or around September 2017, Dr. Halikman asks nursing to reassign Arizona cases being sent to her – instead to someone with an AZ medical license because it is a felony. Dr. Halikman was reported to her Supervisor (for refusing to commit a felony on behalf of United HealthCare), and

344.     On or around September 2017 Dr. Jody Helmick acknowledges that she is aware

that Dr. Halikman's pet dog, Sam, is dying.

345.     On or around late September, Dr. Halikman sends a courtesy email to the Team

that she will leave a little early for the Jewish High Holy Days to say memorial prayers

for her father. She is  harassed and threatened and an attempt is made to prevent her from

leaving   a   few   minutes   early   for   the   Jewish   New   Year.   **(RELIGIOUS

DISCRIMINATION)**

346.     On or around mid-October 2017 Dr. Velarde tells the Team, "There's a rumor

going round that we're going to fire people."

347.     On or around October 2017 Dr. Jeanette McDaniel speaks out vehemently in a

Team meeting about the "stealing of the easy cases out of Medical Directors'queues by

some Medical Directors trying to meet their daily quotas and get done early, leaving only

the harder more time consuming ones."  Dr. Halikman is cited for sticking up for Dr.

McDaniel. This is added to her annual review.

348.     On or around mid September, Dr. Halikman decisions a case. The window for a

peer to peer to discuss the case is 2 weeks. One month following the decision, the United

Account Manager gets involved and attempts to force a reversal of the decision **(URAC

VIOLATION)** Dr. Halikman tells the Account Manager that the decision won't be

changed, that trying to charge for the same thing multiple ways is unbundling, and, when

she pushes, that the Account Manager is a party to fraud by trying to get an insurance

company to pay for surgery they know is cosmetic by stating non-truths that do not align

with photographic images.

349.     On or around October, Dr. Halikman reports the above case to the Team Leads

350.     ON or around October, Dr. Halikman also reports the case to Dr. Nelson. The case from over a month ago should be sent to Appeals. Dr. Nelson wants Dr. Halikman to change her determination and Dr. Halikman refuses to do so though she did multiple courtesy peer-to-peer calls. Dr. Nelson writes Dr. Halikman up for insubordination, & although the P2P was already reassigned, she again reassigns the case to another Medical Director, and then coerces him to approve it to deal with the Account Manager's complaints about the initial denial of cosmetic surgery that the insurance was not going to pay for. (**URAC VIOLATION**)

351.     On or around October 2017, Dr. Nelson tells Dr. Halikman that her unwillingness to change her determination she has decided that Dr. Halikman must have a "mental impairment." **(Threatening, Intimidation, DISABILITY DISCRIMINATION)**

352.     On or around October 2017 Dr. Nelson sends an email removing Dr. Loftin from the difficult case and reassigning it to Dr. Genta.

353.     On or around late October 2017, Dr. Gordon Genta notifies Dr. Halikman that he was "*forced to change the decision by Dr. Nelson but agreed with her initial determination in the case,*" (**URAC VIOLATION**) and

354.     On or around October 2017 Dr. Nelson demands that Dr. Halikman "go get a medical exam through EAP" and states that "you are disabled in your brain." **(DISABILITY DISCRIMINATION)**

355.     On or around October 2017, the nurses let Dr. Halikman  know that all cases with very short turn around times marked expedited are all being assigned to her and that the Case Assignment Tool which is supposed to distribute the cases "evenly" among 70-80

medical directors appears to not be working properly. One nurse tells Dr. Halikman, "it is assigning you 99% of cases!" **(HARASSMENT, RETALIATION)**

356.     On or around October 24, 2017, only the Seniors had control over the Case Assignment Tool and how the case work was being funneled among the 80 medical directors, and

357.     On or around October 24, 2017, Dr. Nelson "weaponized" the Case Assignment Tool to create a hostile work environment, intentionally inflict emotional distress, attempt to cause forced errors in work product, and impact and do Dr. Halikman harm by exacerbating a known disability (GAD), **(HARASSMENT, RETALIATION, DISABILITY DISCRIMINATION),** and

**358.**     On or around October 2017, Dr. Nelson falsely documents that Dr. Halikman has been offline while Dr. Halikman is working and being cc'd on her documentation, and

359.     On or around October 2017 Dr. Nelson and Dr. Robert Kantor meet with Dr. Halikman two-on-one to intimidate her and create a hostile work environment, and

360.     On or around October 2017 Dr. Nelson demands that Dr. Halikman take a medical examination non-confidential by United's doctors. She also demands Dr. Halikman's PHI by asking her to sign a release, which Dr. Halikman won't do.

361.     On or around early November 2017, Dr. Nelson then puts Dr. Halikman on a Corrective Action Plan - she says for violations of "Code of Conduct." She tells Dr. Halikman that this "CAP" will consist entirely of meetings every few weeks for discussion where she will be asked to check in with her and Dr. Kantor to "discuss your progress," but other than Meetings, there is no "Plan" in "Corrective Action Plan" and it is unclear what specific Conduct needs to be changed, and

362.     No "corrective actions" were given for Dr. Halikman to follow, and

363.     The CAP was supposed to last 90 days from November 6, 2017, and

364.     On or around November 2017 Dr. Halikman submits documentation that Account
Manager tried to coerce a change in Dr. Halikman's determination. **(URAC
VIOLATION)**

365.     On or around November 2017, Dr. Halikman fell and sustained an injury to her
right foot.

366.     On or around November 2018 two Physician Assistants join the team. They have
no direct supervision by a same state physician which is a **violation of State law.** They
are making decisions concerning cancer patients.

367.     On or around November 8, 2017 Dr. Halikman **requests PTO** for the
Thanksgiving Holiday to spend it with family after the death of her father. Dr. O'Bryant
responds on 11/09 that "we already have the maximum number approved for Tuesday
and Wednesday -- 11/21 and 11/22. The committee had to turn away many who had
requested to be off on those dates, so *I'm sorry that those dates cannot be approved for
you.*"

368.     On or around November 10th, 2017 (the very next day), other Medical Directors
making the same request and are approved for those days off by Dr. O'Bryant, and

369.     On or around this time, Dr. Nelson jumped into the discussion to harass Dr.
Halikman stating, "you are not eligible to take those days off," and

370.     On or after November 2017, Dr. Halikman submitted a request for her
compensatory day off following her upcoming on-call weekend of Dec 16-17.   Dr.
Nelson harassed her over her request.

371.    On November 15, 2017 Dr. Halikman responded to the Corrective Action Plan
CAP from Dr. Nelson.

372.    The following day, on November 16, 2017, United alters its Telecommuting
Policy, and

373.    On or around November 20, 2017, Dr. Jody Helmick who follows Dr. Halikman
alphabetically and is therefore her point person, does not take care of a case while Dr.
Halikman was out of the office. Instead she sends Dr. Halikman a note at 9:32 PM stating
"this case is currently overdue." She is reminded that she IS Dr. Halikman's coverage &
point person.

374.    On or around November 21, 2017, under the direction of Dr. Jeanette Velarde,
Medical Director Dr. Charles Harrison lectures all of United's Medical Directors on
Breast Reconstructive Surgery following Breast Cancer. Medical Directors across United
are instructed on how they should deny repeat surgeries as "cosmetic and not
reconstructive." Dr. Halikman tells Dr. Helmick that those statements directly **violate the
1973 Federal Mandate**. Minutes later, Dr. Halikman is called into a meeting with Drs.
Kristin Schaad Nelson and Dr. Robert Kantor.

375.    On November 21, 2017, Dr. Halikman is asked if she wants to say anything about
her CAP. Dr. Halikman indicates that everything she had to say was contained in her
written response to her CAP dated November 15th, 2017. Dr. Nelson replies that she
received Dr. Halikman's written response to the CAP, and she is livid. She stated, in
response to your letter I am now opening a case with Employee Relations (a Direct
**RETALIATION against Dr. Halikman).** She stated to Dr. Halikman, ***"Your written
response Amy – it's not just a problem for me, it's a problem for the Entire Enterprise.***

Management Team at United." **(UNITED'S PATTERN OF HARASSING & RETALIATING AGAINST WOMEN)**

382. On or around that time, Dr. Halikman learned that Dr. Sarma Satya had been sent to an office that was not properly equipped to do our job, and

383. On or around November 22, 2017, Employee Relations tells Dr. Halikman that they have just become aware that she filed a religious accommodation with her Supervisor, Dr. Kristin Nelson. This was over three months since Dr. Halikman's dad died, and

384. On or about November 27, 2017, Dr. Halikman speaks with Dr. Jody Helmick regarding the Audit tool and asks her how her audits have been and how she is doing on those overall. Dr. Jody Helmick lies to Dr. Halikman's face and tells her that she has no access to that information. Dr. Halikman knows this to be a lie, and

385. On or around November 28 2017, a day after Dr. Halikman spoke with Dr. Jody Helmick, Dr. Luban a fellow Medical Director calls Dr. Halikman and tells her that Dr. Jody Helmick just called him and said "I have not talked to Amy in a long while" and wanted to know if he was talking to Dr. Halikman. It was strange that Dr. Helmick would say this to Dr. Luban when she talked with Dr. Halikman the day before. **(SLANDER)** Notably, Dr. Jody Helmick never talked to Dr. Luban.

386. On or around November 28, 2017, Dr. Halikman got a call from Dr. Jennifer Lewiston who is close to Dr. Jody Helmick, and Dr. Lewiston is pumping Dr. Halikman for information. She said that she just had a call from Dr. Jody Helmick who stated she "had not talked to Amy in a long time and is just wondering what is going on with her." It

77

was strange that Dr. Helmick would say this to Dr. Lewiston when she talked with Dr.

Halikman the day before. **(SLANDER, ISOLATION FROM PEERS)**

387.      On or around November 28, in between doing 8 hours of case work, Dr.

Halikman contacts United about needing a sit-to-stand desk and 2 monitors and the same

set-up as all of the other Medical Directors on her Team, and that she will be bringing a

S/A (Dog).

388.      On or around November 28,  Dr. Halikman suffered from palpitations.

389.      On or around November 29 Dr. Halikman let Dr. Velarde's and Dr. Matthew

Shelley's Secretary and Administrative Assistant know that she had an injured right foot

and was told no driving, no stairs. And in a foot brace. Dr. Halikman told the

Administrative Secretary to please let Dr. Velarde and Dr Nelson both know. She states

that she will do that.  She contacts Dr. Halikman back that she must "prove" she saw a

doctor and Dr. Halikman is told to get the doctor's notes for them because United would

need those notes from Dr. Halikman's private medical records; and

390.      On or around November 29, 2017, Dr. Kantor tells E&I that  certain genetic

testing United *won't be covered for Ashkenazi Jews."* He asks Dr. Halikman casually in

front of the group if she has any questions.

391.      On or about Nov 29 the Supervisor at the site Dr. Halikman is assigned to go to

was immediately upset when told Dr. Halikman has a service dog. She tells Dr. Halikman

to mention this to Dr. Nelson. United signed a non-ADA compliant lease which excludes

all animals from being brought onto the premises.  She also tells Dr. Halikman that there

is "no I.T. guy to get you set up here," and also that "there is no privacy for HIPAA-

compliant peer to peer calls to MDs," an integral part of Dr. Halikman's job. Dr. Halikman relays all of the above to Dr. Nelson's and Dr. Velarde's assistant.

392.      On or around November 29, Dr. Halikman notifies Dr. Nelson about the lack of an I.T. guy, no privacy for p2p calls, S/A, sit-to-stand desk medical accommodation, ergonomic wrist rest, 2 monitors same issue as others on her Team to do her work, right (driving) foot in brace due to injury, inability to lift. Dr. Halikman lets Dr. Kristin Schaad Nelson know this is not just an inconvenience without obvious benefit, but it is a violation of her medical accommodation for a disability.  Dr. Halikman indicates that she has a dog at home who is dying and that she does not want to leave him all alone in his final days. Dr. Halikman is forced to go to this office, with the threat of losing her job if she doesn't go.

393.      On or around November 30, 2017, Dr. Jody Helmick taunts Dr. Halikman, "*Be careful driving tomorrow. We do not want any accidents just because you are concerned about cases!*"

394.      On or around November 2017, in an attempt to further isolate Dr. Halikman from her Team and Teammates, Dr. Nelson invited a colleague of Dr. Halikman's, Dr. Jody Helmick, into a confidential work meeting in which Nelson planned to discuss her CAP with Dr. Halikman in **violation of Dr. Halikman's right to privacy** surrounding her employment.

395.      On or around November 2017, Dr. Halikman asked Drs. Helmick and Nelson for the results of the independent audit reviewing the quality of everyone's work and was told those results were not available. Dr. Halikman knew this to be a lie; and

396.      On or around November 2017, Dr. Nelson *violated the terms of the CAP*,

397.    On or around November 2017 Dr. Halikman is told that she will not have standard issue monitors when working at the office site, and

398.    There was no legitimate business reason or justification for Dr. Halikman to be forced to commute to an on-site location. Nonetheless, Dr. Nelson continued to force Dr. Halikman to commute from her home to a less desirable location without appropriate equipment and knowing that this represented a hardship for her and **worsened her disabilities** while also knowingly **inflicting intentional emotional distress.**

399.    Dr. Kristin Schaad Nelson did all this to Dr. Halikman knowingly and with malicious intent to harm Dr. Halikman and in retaliation for Dr. Halikman's protected act of reporting on Nelson's illegal activities; and

400.    On or around December 2017 Dr. Halikman was sent to an office without two monitors (standard issue for the job),

401.    On or around December 2017, Dr. Halikman was sent to an office without phone lines, (standard issue for the job), without which one is not able to make a peer to peer phone call; and

402.    On or around December 2017, Dr. Halikman was sent to an office without a voice mailbox (standard issue for the job),

403.    On or around December 2017, Dr. Halikman was sent to an office without a location for making HIPAA Compliant Peer to peer calls (standard arrangement for the job),

404.    On or around December 2017, Dr. Halikman was sent to an office without a sit-to-stand desk (an already granted medical accommodation),

405.    On or around December 2017, Dr. Halikman was sent to an office without an ergonomic wrist rest (an already provided medical accommodation),

406.    On or around December 2017, Dr. Halikman was sent to an office without parking nearby  (a needed medical accommodation),

407.    On or around December 2017, Dr. Halikman was sent to an office without a headset (standard issue for the job),

408.    On or around December 2017, Dr. Halikman was sent to an office without wires to hook up the computer (standard issue for the job), and without I.T.

409.    On or about December 2017 Dr. Halikman went to an office that did not supply her with an access card, to leave to walk S/A or to use the bathroom or to get lunch, and

410.    On or about December 2017 Dr. Halikman went to an office that required her to use two different size screens, one with very large and one with very small font, which resulted in induced symptomatic anisometropia; and

411.    On or about December 2017 Dr. Halikman went to an office that was not set up with privacy or phone lines for peer to peer calls, a required part of her job, but the calls were continuously scheduled for her anyway and Dr. Halikman was cited for not making them, and

412.    On or about December 2017, Dr. Halikman experienced chest pain throughout her 'vacation';

413.    On or about December 2017, Dr. Halikman received a call from United to get details of her right foot injury. Dr. Halikman told the woman who contacted her that she was in a lot of pain and told not to drive and stay off of it. Dr. Halikman told her that she was seen by a surgeon; and

81

414.    On or about December 2017, Dr. Halikman experienced continued severe medical
problems throughout her vacation; and

415.    On or around December 2017 pictures of naked men at computers were again
circulated in the E&I Department to the objection of all of the female medical directors.
In particular, two of the male medical directors find this especially amusing and text the
images to some, and show it in smaller staff meetings to others; one senior is aware and
does and says nothing; This is particularly disturbing coming from a known sex-offender,
**(SEXUAL & GENDER HARASSMENT)** and

416.    On or around December 2017, while on vacation, Dr. Halikman was harassed
non-stop by Dr. Jody Helmick and Dr. Kristin Schaad Nelson, who called her, wrote her
emails, left her voice mail messages, called her land line, called her cell phone, and
texted her throughout her vacation. In addition Dr. Halikman received calls from
Employee Relations and other medical directors who stated that they were calling her,
"because Jody (Helmick) is asking me about you."

417.    On or around December 2017, Dr. Kristin Nelson and her assistant, Dr. Jody
Helmick, repeatedly harass Dr. Halikman while she is trying to vacation and recuperate
from the unrelenting months of harassment. In Nelson's own words, "***While Amy was on
PTO (Paid Time Off)… I reached out to the cell phone number listed in HR Direct for
Amy. She did not respond. My Team lead also reached out to three different numbers
but Amy did not respond…. I sent an email…. Both Jody and I tried to reach you at the
cell phone number on file…..I discussed this "situation" with Amy and told her she
needs to respond to all emails (while on her vacation). This was also discussed with
Amy on our call with Dr. Kantor.*"* She enters a note into Dr. Halikman's CAP and cites

Dr. Halikman for this in her Annual review as well, for "not responding to her (Nelson) while Dr. Halikman was on vacation." Dr. Kristin Schaad Nelson labels this "insubordination."

418.    On or around December 2017, Dr. Jeanette Velarde, Vice President and Dr. Kristin Nelson's Direct Supervisor, also piles on and cites Dr. Halikman for "*insubordination*" for "*not responding to us when you are on vacation.*" And "*That is not acceptable behavior.*"

419.    On or about December 2017, Dr. Halikman is unable to do her job due to multiple equipment issues at the on-site office. Dr. Halikman let others in a Team Meeting know about the problems that she was having with equipment at the on-site office.

420.    On or about December 2017, the desk and chair Dr. Halikman was provided on-site require her to hunch over to a computer screen below eye level. This results in severe back pain. Dr. Halikman notified Dr. Nelson and Dr. Velarde's secretary about this.

421.    On or about December 12, 2017, a notice from Building Manager to United stated "*it is building policy and SPECIFICALLY A REQUIREMENT OF UNITED HEALTHCARE'S LEASE THAT ANIMALS ARE NOT PERMITTED IN THE BUILDING so I must request that you please ask Ms. Halikman not to bring her dog into the building effective immediately.*"

422.    On or about December 12, 2017, United HealthCare supervisor told Dr. Halikman that the building lease specifically excludes all dogs including service animals and Dr. Halikman was therefore being asked to leave. She also stated, "*I'm sorry since she is so well-behaved. This is not up to me. Sorry.*"

423.    On or about December 13, 2017, <u>Employee Relations</u> is notified that Dr.
Halikman is unable to go to the building Dr. Nelson wants her to go to, because they have
a non-ADA compliant lease agreement.   Dr. Halikman is told that a "***reasonable
resolution would be for you to work from home as you've done for the past five years.***"
Dr. Halikman tells her that she will need that "in writing"

424.    On or about December 13, 2017, Dr. Bill O'Bryant tries to reach Dr. Halikman
and wants to know when she will have time to talk. He starts the conversation with
"small talk" and Dr. Halikman interrupts and asks him what exactly he wants. Dr.
Halikman lets him know she is now – finally - angry,  and she is upset by yesterday's
'incident' and what was done to her.

425.    On or about December 13, 2017, harassment continues, as Dr. Jeanette Velarde
tells Dr. Halikman that "We tried to get hold of you during your vacation and didn't get a
response" and "that is not acceptable behavior."   She further states this is being made a
part of the CAP and your Annual review where it will impact your 2017 Bonus.

426.    On or about December 13, 2017 Dr. Halikman learns that United HealthCare has
no policy for service animals.

**427.**    On or about December 13, Dr. Halikman speaks with H/R about the hostile work
environment, about being told to commute with a bad back and injured foot, then being
told to get out of the building with her service dog, then being told to commute more
back home, then interference with her job duties, ALL retaliatory actions for calling Dr.
Nelson out for her URAC violation. Dr. Halikman also tells her that the distractions are
impacting her productivity and at some point will affect the quality of her work as well.
Dr. Halikman also states that her Supervisor eliminated her medical accommodation for

her back and that now her back is hurting her. Dr. Halikman also states that she is very

upset by all of this harassment by Drs. Velarde, Helmick, Kantor and Nelson. Dr.

Halikman tells her that she is in H/R and that they need to do something about it

immediately because it has to stop.

**(FAILURE TO PROVIDE RELIEF) (COLLUSION AMONG MANAGEMENT
AND H/R, same as at Google)**

428.     On or about December 13, 2017, Dr. Bill O'Bryant contacts Dr. Halikman and

tells her that the incident from 12/12/2019 has gone "all the way up to the very top of

Corporate Management at United" and that "they decided they will not get a Certificate

of Insurance for her given that having a dog puts their building lease at risk and now

there's a threatening letter to United for violation of their lease. They are worried about

potential liability should anything happen no matter how remote that possibility. He gives

Dr. Halikman two options, leave your dog at home and work without the service animal

or work from home as you've done for the past five years before Dr. Nelson started all

this." Dr. Halikman agrees to work from home.

429.     On or about December 13, 2017, Dr. O'Bryant is informed about how deeply

humiliated and upsetting the 12/12 incident was and "apologized on behalf of United for

doing that to Dr. Halikman." Dr. O'Bryant heard how upset Dr. Halikman was and

apologized several times to her for what United did to her;  and

430.     On or about December 13, 2017, Dr. O'Bryant is informed that now her entire

computer set-up at home is now in disarray from being moved with several programs not

working properly, and

85

431.    On or about December 13, 2017, Dr. O'Bryant is informed that the office was not

properly equipped and both Velarde and Nelson knew that and did nothing to rectify it,

and

432.    On or about December 13, 2017, Dr. O'Bryant is informed that both Drs. Nelson

and Velarde were aware of this and other conditions at this office and did nothing to

rectify the situation for two weeks, and

433.    On or about December 13, 2017, Dr. O'Bryant was informed that Dr. Halikman's

medical accommodations had been taken away for the two weeks that she was made to

work at the on-site office, and

434.    On or about December 13, 2017, Dr. O'Bryant was informed that the commute

itself created a tremendous hardship by exacerbating several medical problems, and

435.    On or about December 13, 2017, Dr. O'Bryant informed Dr. Halikman that she

was near the top of her group in terms of the audit and productivity, and

436.    On or about December 13, 2017, Dr. O'Bryant told Dr. Halikman that he would

memorialize their conversation in writing, and that she will be working from home from

now on and moving forward.

437.    On or about December 14, 2017, H/R tells Dr. Halikman to complete paperwork

to obtain an accommodation to have a service animal with her in her own home.  Dr.

Halikman is told that Dr. Velarde wants her to complete the paperwork for an

accommodation to have a dog. This occurs after Dr. O'Bryant has said to work from

home; and

438.    On or about December 15, 2017, the National Letter Team asks Dr. Halikman to

correct a spelling error in one of her letters, and they cc her Supervisor Kristin Nelson

about this simple correction needed, and as it turns out, there are no
spelling/grammar/syntax errors in the letter, and

439.    On or about December 15, 2017, Dr. Halikman learns that Dr. Velarde's Assistant
did not provide her with proper login information needed for her on-call to do Pharmacy
cases, though it was requested weeks in advance, and

440.    On or about December 15, 2017, Dr. Halikman is sent Arizona cases that require
an AZ State License to do, and she is told "United Supervisor wants you to do them and
you must do these," and

441.    On or about December 15, 2017, Dr. Kristin Nelson encourages all 70-80 Medical
Directors to instruct the nurses to send any cases they can't get to during the week and
left in their queue, to the on-call Medical Director to do over the weekend, and

442.    Medical Directors Dr. Wheeler, Dr. Marty Cohen, Dr. Joe Eshelman, Dr. Jody
Helmick, Dr. Jeffrey Luban, Dr. Kathryn Stewart, Dr. Chris Sivak, Dr. Tanu Pandey, Dr.
Xavier Sevilla, Dr. Michael Behrend, Dr. Deanne Lisby, Dr. Jeanette McDaniel and Dr.
Nighet Razvi all dump work that they should have completed during the week on Dr.
Halikman to do for them over the weekend in addition to the Pharmacy cases, and

443.    On or about December 15, 2017, Dr. Halikman learns that Dr. Acquenetta
Wheeler, a female Medical Director, was abused by management, and

444.    On or about December 15, 2017, Dr. Halikman learns that another female
Medical Director was abused by United Management, Dr. Kimberly Vorse, and

445.    Dr. Vorse is told she lacks "emotional intelligence," and

446.    On or about December 15, 2017, Dr. Halikman learns that another female
Medical Director was abused by United Management, Dr. Marva Ayers, and

87

447.    On or about December 15, 2017, Dr. Halikman learns that another female Medical Director was abused by United Management, Dr. Maryanne Ilnickij, and

448.    On or about December 15, 2017, Dr. Halikman learns that another female Medical Director was abused by United Management, Dr. Christine Petty, and

449.    On or about December 15, 2017, Dr. Halikman learns that another female Medical Director was abused by United Management, Dr. Barbara Hoffman, and

450.    Dr. Hoffman is told she lacks "emotional intelligence," and

451.    On or about December 15, 2017, Dr. Halikman learns that another female Medical Director was abused by United Management, Dr. Theresa Michel, and

452.    Dr. Michel is told she lacks "emotional intelligence," and

453.    On or about December 15, 2017, Dr. Halikman learns that another female Medical Director was abused by United Management, Dr. Eva Ostrowski,  and

454.    On or about December 15, 2017, Dr. Halikman learns that another female Medical was abused by United HealthCare Management, Dr. Gerilynn Metoyer, and

455.    On or about December 2017, Dr. Halikman learns that another female Medical Director was abused by United Management, Dr. Ellen Stewart, who was threatened by Dr. Robert Kantor regarding going to the Arizona Medical Licensing Board about United's illegal activities regarding the AZ State cases, and

456.    On or about December 2017, Dr. Halikman learns that another female Medical Director and single mother was nearly sexually assaulted by one or more married male medical directors during training in Minnesota at her hotel room and that Dr. Robert Kantor conspired with Management to cover it up, and

457.    On or about December 16, 2017, Dr. Halikman was unable to access PAS cases in

any way and Dr. Halikman notified the Team Lead who tells her not to worry and "just

do the cases dumped on you by your 'Teammates,'" and

458.    On or about February 2018, Dr. Bill O'Bryant announces that the "problems that

prevented people from accessing PAS Pharmacy cases from November 2017 until

January 16th, 2018 have been resolved as of 1/16/2018," and

459.    On or about December, 2017, Drs. Nelson and Kantor tell Dr. Halikman that they

know she didn't do any PAS cases and was unable to access them while on-call and they

were adding that to her CAP and to her annual review where it would impact her 2017

Bonus, and

460.    On or about December 16, 2017, Dr. Halikman was told about a letter from

Senior Medical Director Lewis Gregory of South Carolina to Dr. Satya Sarma which was

read by another Medical Director on the Team.  This individual tells Dr. Halikman she

"is aware that the management at United is capable of doing a lot of really, really bad

things" and that Satya filed an E.E.O.C. complaint. She tells Dr. Halikman that Velarde

was especially abusive to Satya and also to Acquenetta Wheeler, both women medical

directors.

461.    On or about December 2017, another medical director tells Dr. Halikman that

"Dr. Jeanette Velarde went after Satyta who uncovered Velarde's scheme to save money

by denying elderly patients their home health care," and

462.    On or about December 2017 an overseas employee of United working from

Science Hub tower #3, Taguig City, Philippines, advises Dr. Halikman that she must do

Arizona cases. Dr. Halikman explains that she is not licensed in AZ and to please notify

her Supervisor that it is illegal for her or anyone without an Arizona State license to do Arizona cases. She tells Dr. Halikman that her Supervisor told her to "route the case to Dr. Halikman and someone with an AZ License will just 'sign off on it' later.

463.     On or about later that same day, another United Representative tells Dr. Halikman, "you have to do the AZ case" and Dr. Halikman tells him to relay to his Supervisor that she does not want to do it and can be charged with a felony and lose her medical license. She is told, "I think you just have to review this – thank you."

464.     On or about December 2017 UnitedHealthCare Medical Directors are again given an hour-long lecture by Dr. Charles Harrison and told to deny reconstructive surgery to breast cancer survivors. They are told "this is cosmetic surgery." This is a **violation of the 1973 Federal Mandate** regarding patients with Breast Cancer, and

465.     On or about December 2017, Dr. Halikman learns that "everyone loses access to PAS, you are not the only person with this issue," though Dr. Halikman was nonetheless written up for this by Dr. Nelson, and

466.     On or about December 19, about one week after Dr. O'Bryant told Dr. Halikman to work from home, Dr. Nelson demands that Dr. Halikman fill in paperwork for a service dog and gives her a deadline to do it or be fired for insubordination, and

467.     On or about December 19th, Dr. Halikman asks Dr. Nelson to explain why she needs paperwork to have a dog in her own home and she threatens Dr. Halikman's job if she does not fill in the paperwork, and

468.     On or about December 19th , 2017,  Dr. Nelson interrupts Dr. Halikman's work to admonish her for not responding to her phone calls while on vacation. Kristin Schaad Nelson states that "failure to do so is insubordination," and

469.     On or about December 19, 2017, Dr. Nelson interrupts Dr. Halikman's work and

demands to know what she was doing on her computer during her vacation time, and

470.     On or about December 19, 2017, Dr. Nelson interrupts Dr. Halikman's work -

and tells her that not responding to her emails while on vacation is also insubordination,

and her tone was threatening and vicious and Dr. Halikman experienced chest pain,

nausea and vomiting, and

471.     On or about December 19, 2017, Dr. Nelson interrupts Dr. Halikman's work and

she was unable to concentrate following her interruptions, and Dr. Halikman makes

several calls to report Dr. Nelson's behavior, and

472.     On or about December 19, 2017, Dr. Halikman attempted to call Bill Hagan to

report the harassment and abuse but there is no answer, and

473.     On or about December 19, 2017, following Nelson's interruptions of her work,

Dr. Halikman suffers a full blown attack, and

474.     On or about December 2017, the team SME for oncology Dr. Shamoon Ahmad,

advises Dr. Halikman to "just sign my name" without looking at the case, and Dr.

Halikman reports this to Dr. Jody Helmick and she advises her that it is "no big deal, just

go ahead and use Shamoon's name," and

475.     On or about December 19, 2017, Dr. Velarde interrupts Dr. Halikman's work and

tells her that she was insubordinate for not responding to her and Dr. Nelson and Dr.

Helmick over her vacation and that she will write Dr. Halikman up over this again, and

cant' concentrate on case work, and after the call Dr. Halikman is sick and vomiting and

dizzy and can't move her right arm and right leg and lie down, and

476.     On or about December 19, 2017, Dr Velarde calls and threatens Dr. Halikman
again and Dr. Halikman develops palpitations during this call. She tells Dr. Halikman, "*I
was watching everything you did during your vacation Amy.*" And "*I could see your
every move while you were on vacation and I know what you were doing and when.*"
She tells Dr. Halikman the day and time that she used her computer. She threatens Dr.
Halikman again stating, "if your Senior wants to reach you at any time you need to be
available to her whenever she contacts you, failure to do so is insubordination and you
will be cited accordingly." Dr. Halikman becomes violently ill after this phone call.

477.     On or about December 19, 2017, Dr. Kristin Schaad Nelson goes into Dr.
Halikman's CAP and personnel file and backdates an entry by several weeks.

478.     On or about December 20, 2017, H/R calls Dr. Halikman at 5:30 in the morning
regarding a fair and unbiased hearing that would need to exclude Dr. Jeanette Velarde-
Dunbar.

479.     On or about December 20, 2017, Dr. Halikman tries to add beneficiaries to her
Life Insurance Policy, and

480.     On or about December 20, 2017, another female Medical Director tells Dr.
Halikman how she is being severely abused by Dr. Kristin Schaad Nelson and how Dr.
Nelson has told her that "she lacks emotional intelligence" and is harassing her on a daily
basis, and

481.     On or about December 21, 2017, a complaint about a case determination is
received. It is stated in writing that Dr. Halikman failed to do a peer to peer as required.
However, the request for p2p was not within the 14 days, and Dr. Halikman followed
United's protocols for adjudicating the request. The case was denied for lack of

information, specifically, no photos from the provider. The case is in the Appeals
Department now, but Dr. Jeanette Velarde, a United Vice President,  instructs Dr. Eugene
Loftin to revise the case in Prior Authorization. Drs. Nelson and Kantor are cc'd on this
correspondence. (**URAC VIOLATION) Dr. Loftin does as he is told.** The Customer
Service Rep asks Dr. Velarde to have the decision on the case overturned and Velarde
asks Dr. Loftin to approve it, ie. Dr. Loftin at Dr. Velarde's request, in the PRIOR AUTH
DEPARTMENT, enters a case while it is in APPEALS DEPARMENT and overturns Dr.
Halikman's decision.  (**URAC VIOLATION, VIOLATION OF BOTH STATE &
FEDERAL LAWS)** The MD had already filed an appeal, and

482.      On or about December 22, the above group of Dr. Jeanette Velarde-Dunbar, Dr.
Eugene Loftin, Dr. Kristin Schaad Nelson, Dr. Robert  Kantor colluded and conspired to
spread non-truths about Dr. Halikman's work product stating repeatedly in chain emails
that Dr. Halikman failed to do a required p2p within the appropriate time frame,
something they knew or should have known not to be true, in an effort to damage her
professional reputation and defame her character, and they did this all the while they
were themselves all engaged in actively committing a URAC VIOLATION;
(**COLLUSION AND CONSPIRACY TO DEFAME WITH THE INTENT TO
HARM)**, and

483.      On or about December 22, 2017, Dr. Halikman contacted H/R about Dr. Nelson's
demands for paperwork to keep her own dog in her own home, and

484.      On or about December 22, 2017, Dr. Halikman learns that the Letter team were
given instructions by Dr. Kristin Schaad Nelson to handle her work differently than
others, looking for anything at all to cite Dr. Halikman for no matter how small,

**(INCREASED SCRUTINY OF DR. HALIKMAN's WORK AND HARASSMENT),**

and

485.    On or about December 22, 2017, Dr. Halikman is medically ill from the stress and

her disabilities are exacerbated, and

486.    On or about December 26, 2017, Dr. Halikman starts to receive behavioral health

cases which she has never gotten before. One case after another that is assigned to her are

for patients who are suicidal or suffering from major anxiety or depression.  She asks the

RN to send to the behavioral Health team and she states she does not know why those

were being funneled to her in the first place, and

487.    On or about December 27, 2017, Dr. Halikman complains to H/R about

harassment by Dr. Kristin Schaad Nelson and also notifies H/R about the 12/22/2017

letter which disparages her reputation and how it was circulated among many Medical

Directors.

488.    On or about December 28, 2017, Dr. Halikman experiences palpitations at work.

489.    On or about December 28, 2017, Dr. Halikman has a 40-minute meeting with Dr.

Kristin Schaad Nelson and Dr. Robert Kantor during which she takes extensive notes. Dr.

Nelson states:

- You failed to do a p2p within the required time frame (LIE),

- Dr. Halikman calls her out for this false statement, stating "that's a total lie and

  you know it, you can't do a p2p in PA when the case is in Appeals," &

- Dr. Robert Kantor says nothing, and

- Dr. Nelson states that she is "adding it to Dr. Halikman's CAP and annual review

  (to impact your 2017 Bonus), &

- Dr. Kristin Schaad Nelson accuses Dr. Halikman of not doing PAS cases when on-Call, though Dr. O'Bryant will later note that the system was broken between Nov 2017 and Jan.16, 2018 (a fact both Nelson and Kantor would have been aware of), thereby preventing anyone from accessing cases, but they document this nonetheless to use against her; &

- Continued misstatements, threats and harassment by Nelson and Kantor; and

490.    On or about December 28, 2017, Dr. Kristin Schaad Nelson demands that Dr. Halikman do 69 cases, not the normal 25 cases and that Dr. Halikman reach out to Dr. O'Bryant about PAS cases, and

491.    On or about December 29, 2017, Dr. Halikman is physically ill, and

492.    On or about December 29, 2017, Dr. Halikman receives a letter from the Associate Director in Appeals stating that the case is with appeals and is not a prior auth issue and that therefore she is correct and a peer to peer is not appropriate, in compliance with State and Federal Laws, and can not and should not be touched by prior auth personnel, in spite of the fact that Dr. Nelson continues to harass Dr. Halikman about doing a peer to peer, and

493.    On or about December 29, 2017, Dr. Halikman begins to receive cases for which she has never been trained, and

494.    On or about December 29, 2017, Dr. Halikman speaks with H/R about Dr. Kristin Schaad Nelson's interfering with her work, and

495.    On or about December 29, 2017, Dr. Halikman speaks with Dr. Jody Helmick about Dr. Kristin Schaad Nelson's interfering with her work, and what Dr. Nelson is doing is making her physically ill. Dr. Halikman states that she is getting very sick from

the harassment and tells Dr. Helmick that it needs to stop. Dr. Helmick is silent. At this
time Dr. Halikman is still unaware of Dr. Nelson's plans to Bonus Dr. Helmick
Halikman's annual Bonus in addition to Helmick's own, and

496.    On or about December 29, 2017, Dr. Halikman observes that Dr. Loftin who was
"too busy to help with her peer to peers" when her father died, (during United's slowest
time of the year);  is now, (during their busiest time of the year), "shadowing her" in her
peer to peers and contacting providers that she is contacting for peer to peer calls, and

497.    On or about December 29, 2017, Dr. Halikman receives a call from a Provider
telling her that another doctor named Dr. Loftin called for a peer to peer and that this was
a "highly unusual call" and that the doctor "asked us a lot of questions about you and
your interactions on the peer to peer call" and they stated "it was as if they were trying to
get us to say something bad about their own doctors and we did not know what to make
of this call from Dr. Loftin," and

498.    On or about December 29, 2017, Dr. Halikman completed over 12 hours of work
with no breaks, feeling dizzy, lightheaded, faint, syncopal with explosive vomiting and
diarrhea and chest pain, and

499.    On or about December 29, 2017, Dr. Halikman updated the Time Away From
Work Calendar on her time off of 12/30/2017 through 1/5/2018, already approved by the
Holiday Committee, without changing any of the days, but just to reflect a change in
nomenclature that 3 of these days will be used for C.M.E (reading),

500.    On or about January 2018, Dr. Halikman emailed Dr. Velarde about the email she
is circulating falsely stating that Halikman is not doing her job (failure to do a requested
peer to peer within the appropriate time frame). Dr. Halikman advises Velarde that this is

untrue and if she would look at the member's records she will see that the information
she is propagating is false. She has Dr. Kristin Nelson use "failure to do p2p" against Dr.
Halikman anyway in Dr. Halikman's Annual review (which is used to determine the 2017
Bonus), and

501.      On or about January 2018, while Dr. Halikman is on vacation, Employee
Relations contacts her about "obtaining an accommodation to keep her dog with her in
her own home," and

502.      On or around early 2018 Dr. Halikman became aware that thousands or tens of
thousands or more of denials were taking place at United HealthCare without any clinical
review by any United HealthCare physician (Medical Director) and Dr. William
O'Bryant was responsible for oversight and aware; and

503.      On or around early 2018 Seniors Kantor, Nelson, O'Bryant and Copps and Vice
President Velarde-Dunbar and Matthew Shelley distributed "Talking Points" to all of the
Medical Directors throughout the U.S. (in all 50 States) working for United, coaching the
Medical Directors on what to say to U.R.A.C. Auditors if they were interviewed; and

504.      On or around early 2018 UnitedHealthCare Medical Directors throughout the
United States felt threatened and intimidated by Senior Medical Directors Robert Kantor,
MD; Kristin Schaad Nelson, DO; William O'Bryant, MD, Matthew Shelley, MD;
Jeanette Velarde-Dunbar when warned that United's attorneys would be "debriefing
anybody who talked to URAC immediately following their URAC interview for United's
accreditation; and

97

505.    On or about January 2018, while Dr. Halikman is on vacation, Dr. Velarde e-
mails her with an unsubstantiated accusation of 'not caring for patients,' and Dr.
Halikman does not know what she is talking about, and

506.    On or about January 2018, while Dr. Halikman is on vacation, National Letter
Team contacts her about a case note. Dr. Halikman is told that her English is not good.
Dr. Jody Helmick responds that Halikman's note was correct, and

507.    On or about January 2018, while Dr. Halikman is on vacation, Mr. Fran Christy,
Director of Employee Relations, contacts Dr. Halikman to discuss her being allowed to
keep her own dog in her home, and

508.    On or about January 2018, Dr. Halikman is sent several Learn Sources to do by
Dr. Nelson, and

509.    On or about January 2018, Dr. Halikman has a meeting with Mr. Christy in
Employee Relations but he does not show up on time, and

510.    On or about January 2018, Mr. Fran Christy contacts Dr. Halikman and she can
tell that he is somewhere other than his office.  When questioned, he admits that he is in a
Conference Room elsewhere. Dr. Halikman asks him if there is anyone else on this call
and/or if it is being recorded and he hesitates then tells her, "no" but it is strange that he is
not in his office for this call. **(POSSIBLE VIOLATION OF THE CALIFORNIA
WIRETAPPING LAWS BY UNITED)**

511.    On or about January 2018, Dr. Halikman notifies Mr. Christy that she is being
stressed and intimidated by her boss, Dr. Kristin Schaad Nelson, who is threatening her.
Dr. Halikman asks him about their non-existent Service Dog Policy and why they do not
have one. Dr. Halikman tells him that going forward she wants ALL of his requests in

writing. Dr. Halikman reiterates that Dr. O'Bryant told her to work from home on 12/13/2017. Dr. Halikman tells him that she is unable to alter her "New York Jew accent" that Dr. Nelson also has a problem with. Dr. Halikman asks him why she is still being asked by Dr. Nelson to obtain paperwork for a dog in her own home. Dr. Halikman tells him that the work environment is extremely hostile at this point and that they (Kantor, Nelson, Helmick, Velarde) are having an impact on her health and disabilities. Dr. Halikman states that this is discriminatory and that Dr. Nelson is interfering with her ability to do her job**. (COLLUSION AND CONSPIRACY:  Due to H/R's failure to act, one may be left to surmise or assume that H/R Colludes & Conspires with Management against their own Employees at United)** ; and

512.    On or about January 2018, Dr. Halikman becomes aware of a project that will violate the privacy rights of many of her friends in New York City. United has a Team Meeting to introduce the "Weill Cornell Project" in which Drs. Migliori and Wolfe at Cornell in N.Y.C. are involved in a pilot program and partnering with United (Drs. Jeanette Velarde-Dunbar, Dr. Matthew Shelley, Dr. Kristin Schaad Nelson and Dr. Paul Copps) in which Artificial Intelligence (AI) will be embedded by United in all patient records throughout the Medical Center (without the patients' specific knowledge and or consent) in exchange for preferential billing and payment treatment of Cornell (some of whose doctors sit on United's Board and also run Cornell, **Conflict of Interest)** and that Cornell and these doctors in particular will benefit from a different type of review. **(STARK VIOLATION)** In the pilot, doctors will be taught by United how to submit claims in a way that benefits all.  This will enable the doctors and Cornell to submit

higher value claims **(HIPAA Privacy Rule, Stark Violation, NYS/Department of Insurance),** and

513.    On or about January 2018, Employee Relations speaks to the E&I Team about Compensation and Bonuses and announces that United is now in 2018 retroactively discarding the metrics for how the 2017 Bonuses will be calculated and she states that the Bonuses are now "discretionary" which is not true as the Bonuses do not meet the legal definition of Discretionary; **(WAGE THEFT)** and

514.    On or about January 10, 2018, Dr. Jeanette Velarde talks about the Weill Cornell Project and how by working with United, Cornell will make more money than any other hospital in New York City (**Personal inurement for Cornell's Executives, COI, Stark Violation**). By advising the Medical Centers on how they should bill, and data mining patient records for diagnoses, they will be able to make more Medicare dollars. The project begins in January and February 2018 with the embedding of Artificial Intelligence into all of the medical and hospital records at Cornell for 'data mining' (though patients the Medical Directors are all told do not have to consent to this).  The project will have direct oversight by Migliori, Sam Ho and David Wichman at United and Dr. Wolfe at Cornell. Dr. Jeanette Velarde and Dr. Kristin Nelson and Dr. Matt Shelley will have primary oversight of the project and will be assisted by Drs. Paul Copps and Gordon Genta.  The four areas initially involved will be Infertility, Sleep, Veins and ENT.  In exchange for providing United free access into all of their patients' medical *and personal* information, Cornell will do financially very well. Cornells' C.M.O. will also do very well from this arrangement. United's denial rate for services in their commercial line of business is 60% and this is supposed to "help with that."

100

515.    On or about January 11, 2018,  Dr. Halikman becomes ill.

516.    On or about January 11, 2018, Team meeting, Dr. Martin Cohen talks about his
"tough peer to peer calls" in which Providers get nasty and a discussion ensues among
the Team about this issue impacting the Team members.

517.    On or about January 12, 2018, Dr. Halikman contacts Mr. Fran Christy to find out
if they are still requiring her to complete "Accommodation paperwork" to have an animal
in her own home.

518.    On or about January 12, 2018, Mr. Fran Christy asks Dr. Halikman for additional
paperwork to be completed, including he asks her for her dog's "Bathing records."

519.    On or about January 12, 2018, Dr. Halikman is unable to handle the stress from
Dr. Nelson which has exacerbated her disability and she has a bad attack. At or around 8
PM in the evening, H/R calls Dr. Halikman at her home and sends her more forms to
complete for them.

520.    On or about January 13-14, 2018, Dr. Halikman is ill all weekend.

521.    On or about January Dr. Nelson and Dr. Helmick continue to tell Dr. Halikman
that they do not have access to the independent audits of quality on her work.

522.    At the same time, on or about January 2018, other medical directors are getting
their audit performance results.

523.    On or about January 2018 Dr. Halikman learns her audit results for 2017
November and December  (100% work accuracy November and 100% work accuracy
December 2017).  Dr. Helmick who is Dr. halikman's Team Lead continues to lie to Dr.
Halikman stating that she has no access to those audit results; and

524.    On or about January 17, 2018, Dr. Halikman is harassed relentlessly by Dr. Kristin Schaad Nelson while working on a case. This consists of calls, texts, emails every few seconds/minutes scrutinizing her work on a case:

- Dr. Nelson asks Dr. Halikman if she is working a case

- 8 min later Dr. Nelson has case escalated

- 3 min later a noted is entered

- 14 min later Dr. Nelson asks again if she's working the case

- 10 sec later Dr. Nelson pings Halikman are you working case

- 1 min later she responds to Dr. Nelson

- 2 min later case entered

- 1 min later nurse notified

- Dr. Nelson is aware that Halikman has GAD, but

- 1 min later Dr Nelson pings her about the case, and then

- 4 min later Dr. Nelson pings her about the case

- 3 min later texts her about the case

- 10 min later Dr. Nelson says more info in, do the case again

- 5 sec later Dr. Nelson pings her again, and

- 3 min later Dr. Nelson pings her again, and

- 3 min later a text again

525.    On or about January 18, 2018, Dr. Halikman is harassed by a flood of emails from Dr. Kristin Schaad Nelson asking her to respond to her emails, "immediately," "within 24 hours," "before the end of business," etc.

526.    On or about January 18, 2018, Dr. Kristin Schaad Nelson pings Halikman 5 times in 20 minutes. Harassment continues all day; and

527.    On or about January 19, 2018, Dr. Halikman wakes up at 2:10 AM, Chest pain and nausea at 4:45 AM, GI upset. Dr. Halikman is too sick to work.

528.    On or about January 19, 2018, Dr. Halikman speaks with someone in the department and says, "what they are doing to me is impacting my health, I have chest pain, nausea, unable to sleep." Management is now aware that what they are doing to her is causing physical illness. They've done nothing to stop it. Hostile work environment;

529.    On or about January 19, 2018, Dr. Halikman takes unplanned PTO for medical. Dr. Halikman has been made ill by Dr. Kristin Schaad Nelson.

530.    On or about January 23, 2018, Dr. Kristin Schaad Nelson threatens Dr. Halikman at 8:41 AM. Harassment and hostile work environment.

531.    On or about January 23, 2018, Dr. Nelson threatens Dr. Halikman a second time at 10:52 AM and demands to know why, in *her* words, ***"You planned to be sick"*** and "can you explain this to me?" and ***"You are not allowed to take sick time without my permission."***

532.    On or about January 23, 2018 Dr. Halikman spends the morning writing responses to all of Dr. Kristin Schaad Nelson's "timed" emails with "deadlines for a response." This interferes significantly with her ability to do her case work.

533.    On or about January 23, 2018, Dr. Kristin Schaad Nelson demands a response about her having her dog in her own home. She states "***you are not allowed to have a dog without my permission.***" and "***The time has passed. Tell me what your intentions are regarding your disability.***"

103

***534.***      On or about January an IDR Appeal hearing is scheduled to discuss Dr. Halikman's CAP with Dr. Matt Shelley on January 26.  On or about the same day that Dr. Halikman receives this notice, Dr. Kristin Schaad Nelson sends an email to the entire Team stating, "***I'm out on 1/26 for a celebration ☺***"

535.      On or about January 24, 2018, Dr. Kristin Schaad Nelson demanded of Dr. Halikman, "Tell me why you were ill and rescheduled your peer to peers"

536.      On or around January 24, 2018, Dr. Kristin Schaad Nelson approves time off in late March for a Physician Assistant while not approving Dr. Halikman's request to be off on February 19th.

537.      On or around January 24, 2018, Dr. Halikman starts receiving an influx of cases with turn around times of only 60 seconds.

538.      On or around January 26, 2018, Dr. Halikman has a meeting with Dr. Matthew Shelley to appeal the CAP. Employee Relations is there.  Dr. Halikman has not been given full disclosure by Dr. Matthew Shelley about his background which would disqualify him from having oversight over another Medical Director. Though Dr. Halikman is told this is an "opportunity" to discuss the CAP, Ms. Utley unexpectedly repeatedly interrupts her and uses up her time telling her what she can and can not ask or say. After preventing Dr. Halikman from talking, Utley asks for a copy of any notes of what she may have wanted to say to Dr. Shelley. Dr. Halikman is confused by what she does during the hearing, not allowing Dr. Halikman to speak without her many interruptions.

539.      On or about January 29, 2018, a request for medical accommodation is submitted in order for Dr. Halikman to continue to work from home, which she was already told on

12/13 by Dr. O'Bryant that she could do.  Now some of Dr. Halikman's personal medical information and her right to privacy have been compromised by demands made by Dr. Kristin Nelson. Dr. Halikman gave the information although she did not want to, because she was threatened by Dr. Nelson that she would be fired for insubordination if she did not release her personal medical information surrounding her disability to Nelson by Nelson's deadline.  Dr. Halikman was very upset by this, but complied to save her job.  However, Dr. Halikman did not sign any blanket consent for Dr. Kristin Schaad Nelson to enter her medical records and/or to disseminate any of her PHI without her knowledge or consent to any third parties, which is what Dr. Nelson did. She knowingly and willfully **violated Dr. Halikman's HIPAA Right To Privacy.**

540.      On or about January 29, 2018, Dr. Halikman met with Dr. Kristin Schaad Nelson (Arizona) and Dr. Robert Kantor (Minnesota) for her annual MAP review. Dr. Kristin Nelson **gleefully** announced that Dr. Halikman would be receiving "No Bonus and NO raise for work year 2017." Dr. Nelson stated that the Bonus was now "discretionary" which was not true as there were clear metrics for how the Bonuses are calculated. She also told Dr. Halikman that, "Your work is good, even above average, but we have issues with your 'personality'".  Dr. Kristin Schaad Nelson's evaluation of Dr. Halikman was not consistent with any of the objective measures. As one example, independent audits of quality showed Dr. Halikman's work at 100% Nov, 100% Dec, 100% Jan 2018, 100% Feb 2018, but she did not give Dr. Halikman a 5/5.  The lowered review and no bonus represented **RETALIATION** for the November 15th 2017 letter in which Dr. Halikman cited Nelson's URAC Violations, and **WAGE THEFT** for denying an earned non-discretionary bonus based on clear parameters for the prior year.  Further, she stated in

Dr. Kantor's presence that Dr. Halikman's work was above average and that no raise and no Bonus were based on issues they had with "her personality." Dr. Halikman learns that Dr. Jody Helmick received a Bonus disproportionate to any of her peers for her work for Dr. Nelson.

541.    On or about January 2018 Dr. Halikman learns that the male medical directors on average received larger bonuses than the women. Nobody got zero bonus except for Dr. Halikman. Yet Dr. Halikman had the highest accuracy scores for any Medical Director in the upper levels of productivity out of a group of 70-80 doctors. In other words, Dr. Halikman was one of the highest performing Medical Directors on a Team of 70-80 and received no Bonus for her work in 2017, from Dr. Kristin Schaad Nelson.

542.    On or around January 2018 Dr. Halikman replies to her annual review (also called a MAP) that this is part of an ongoing pattern of retaliation and a personal assault on her character and not a reflection of her good work product.

543.    On or around February 2018, **DR. HALIKMAN REPORTED RETALIATION** by Dr. Kristin Schaad Nelson in her MAP to Dr. Matt Shelley VP but got no reply;  and

544.    On or around February 2018, Dr. Halikman receives multiple calls from Risk Management which interfere with her ability to do her job, and

545.    On or around February 2018, Dr. Halikman learns that Dr. Ellen Stewart is very upset because Dr. Robert Kantor is harassing her too; and

546.    On or around February 2018, Dr. Kristin Nelson sends Dr. Halikman an e-mail praising Dr. Jeffrey Luban, and

547.    On or around February 2018, after Dr. Halikman quit, Dr. Nelson meets privately with one of her colleagues, and

548.    On or around February 2018, Dr. Halikman learns that her audits were 100%
accuracy through February 2018 and higher therefore than everyone on her Team, since
none had her productivity and also perfect audits for 4 months in a row, yet all of those
Med Directors received a Bonus; and

549.    On or around February 2018, Dr. Halikman, is asked by an orthopedic surgeon to
send him a case so she does; then he sends it back to her stating that he made a mistake
asking for it; and Dr. Nelson cites Dr. Halikman for sending it to him, and

550.    On or around February 2018, Dr. Halikman is called by members of other
Departments who report to her that Dr. Kristin Schaad Nelson has been calling other
Medical Directors and **SLANDERING** her name and "trying to get dirt on her," but they
"know all about Nelson and know what she is up to,"

551.    Dr. Halikman receives calls stating Dr. Jody Helmick is **SLANDERING** her, and

552.    On or around February 2018, Mr. Fran Christy Director of Employee Relations
requests a meeting with Dr. Halikman. He indicates that he received her doctor's request
for a medical accommodation for her, but now he needs some more information, and this
is two months after Dr. O'Bryant told Dr. Halikman to work from home; and

553.    On or after February 6, 2018, United fails to end Dr. Halikman's CAP in violation
of their own Corporate Policy regarding a CAP, and

554.    On or around February, Scott McCarty who works closely with Dr. Jeanette
Velarde-Dunbar, tells several Medical Directors that it's Velarde's plan to phase out Prior
Auth. McCarty also states that the Weill-Cornell Project will provide Cornell with
United's billing expertise using the information from data mining of patients' medical
records, but that Cornell will submit all of the billing. He indicates that different patients

throughout New York City will be treated differently depending on whether they are seen at Cornell or are seen at some other Medical Center. (**Department of Insurance violation**), and Dr. Gordon Genta states that he is just doing what Dr. Kristin Nelson tells him to do; and

555.     On or about February 2018, Mr. Fran Christy requests more meetings to discuss Dr. Halikman's disability.   Dr. Halikman tells him, "if you have anything more to discuss, put it in writing." She notifies him that he too is now interfering with her ability to do her work. He responds, "I understand." and

556.     On or about February 2018, Dr. Nelson states to Dr. Halikman, "*I did not give you permission to take Holiday time off or time for Continuing Medical Education. Explain yourself to me.*" The harassment continues on a daily basis, and

557.     On February 6, 2018, eight weeks after Dr. O'Bryant told Dr. Halikman that Senior Management has decided you can work from home, Mr. Fran Christy advises Dr. Halikman, "We're allowing you to telecommute."

558.     On or around February 6, 2018, another female Medical Director tells Dr. Halikman that "the stress at United from harassment and abuse is so intense that it caused her to start taking multiple anti-anxiety medications," and Dr. Halikman also learns that another female medical director comes to work high on drugs every day while adjudicating cases and several others have problems with alcohol abuse at work; and

559.     On or about February 2018, Medical Director Ellen Stewart tells Dr. Halikman that Dr. Velarde and Dr. Kantor are particularly malignant individuals who "once they start gunning for you they will do literally anything if they want to get rid of you including but not limited to illegal activities, lying, etc." and

560.    On or around February 2018, Dr. Halikman learns from Dr. Jennifer Lewiston
that Dr. Robert Kantor told her during training that she could increase her speed by not
reading clinicals, and he "advised her to not read the patients' medical records because
that takes too much time, just rely on the nurses notes," **(DEPARTMENT OF
INSURANCE VIOLATION)**, and

561.    On or around February 7, 2018, Dr. Bill O'Bryant states in a Team Meeting that
there was a problem with the PAS Pharmacy case system from November 2017 through
and up until January 16, 2018 and it was just fixed." This is significant since Dr. Nelson
and Dr. Kantor were aware of this, yet they lied and said it was Dr. Halikman's fault that
she was unable to access PAS during her on-call weekend, including citing her for this in
her CAP and in her annual review; and

**562.**    Dr. O'Bryant announces at this same meeting that Dr. Michael Segal reviewed
over five thousand Medicaid cases in one month. And Dr. Ash Chabra on Dr. Kristin
Nelson's Team did over six thousand cases per month. And Dr. Eugene Loftin is doing
thousands of cases per month (all in addition to their regular case work).  All of the
Senior Medical Directors chime in that this is great news, and that we should ALL strive
for such numbers. (To be clear, these physicians are denying 200-300 patients'
medications daily).  This assumes a rate of one case review in less than 60 seconds,
which is impossible to do if you are reading the clinicals.  **(DEPARTMENT OF
INSURANCE VIOLATION)**

563.    On or around February 2018 Dr. Halikman spoke with Dr. Ash Chabra about how
he does six thousand (6, 000) cases in 20 working days, and he admitted to "***not really
reading the clinicals.***" Other cases are signed by physicians who are not even working

109

for United and hence they also are not reading clinicals before OPTUM is denying the medication. **(DOI VIOLATION ALL 50 STATES & WASHINGTON, D.C.)**

564.     SharePoint instructions posted by a Senior Medical Director on how to do Pharmacy cases states:

- Go to reason code

- Click on PA Denial

- Scroll down case notes and go straight to case summary and leave that blank

- Then go straight to decision notes which is pre-populated for you by a pharmacy tech in southeast Asia

- Then copy and paste the drug references,

- Then hit submit.

- There is nothing about examining clinicals

- It's posted under Pharmacy Tips by one of the Seniors

- Impacted plans include Oxford in New York, Texas, regular cases and Kentucky

565.     Dr. O Bryant also announces that from 2/3/2018 on there was no one with a North Carolina license which begs the question who was signing off on those cases since NC requires same state licensure, **(VIOLATION NORTH CAROLINA DOI),** and

566.     On or around February 2018, Dr. Kathryn Stewart announces in a meeting that "honestly, I never do PAS cases," yet she was given a huge bonus in February 2018, and was not cited for not doing PAS cases by her Supervisor,

567.     On or around February 2018, another female Medical Director reports that Dr. Kristin Schaad Nelson is harassing her and had documented that she "lacks emotional intelligence, is unstable and unethical."

568.    On or around February 2018 Mr. Fran Christy calls Dr. Halikman again to harass
her from E/R, and

569.    On or around February 2018, Dr. Kristin Nelson demands proof of C.M.E. and
gives Dr. Halikman 24 hours to respond,

570.    On or around February 2018, Dr. Halikman learns that not a single other
individual on Kristin's Team is asked for proof of their C.M.E., she is harassing Dr.
Halikman again, and

571.    On or around February 2018, Dr. Kristin Nelson sends another harassing email
and gives Dr. Halikman "24 hours to respond," and

572.    On or around February 2018, Dr. Kristin Nelson contacts a business associate of
Dr. Halikman's and slanders her, and

573.    On or around February 2018, Dr. Kristin Nelson is asking nurses about Dr.
Halikman and one nurse tells Dr. Halikman that "it sounds like a witch hunt, watch your
back," and

574.    On or around February 2018, Dr. Halikman discusses the abusive behavior by Dr.
Kristin Nelson with Mr. Fran Christy and asks for relief. Dr. Halikman tells him that this
is impacting her health and well-being. He failed to take any prompt or corrective action.
He also neglects to mention anything about the case opened in E/R following receipt of
Dr. Halikman 's 11/15 email response to Nelson's CAP which Nelson called "a huge
problem for the Enterprise."

575.    It appeared that management and E/R and H/R were all working together and that
Employees at United have nobody looking out for their interests in the case of an out-of-
control ruthless Supervisor; and that, like GOOGLE, United's Human Resources and

Employee Relations squash anyone that brings a complaint about Management. In fact, what they do is they "team up against the employee" (**Violation of Labor Law, DOL**) Their bad behavior is institutionalized and in this way they "Silence" their employees.

**(COLLUSION AND CONSPIRACY BETWEEN MANAGEMENT AND HUMAN RESOURCES AGAINST UNITED'S EMPLOYEES)**

**DR HALIKMAN SOUGHT H/R'S HELP FOR RELIEF FROM DR NELSON HARASSMENT AND RETALIATION FOR NOV 15 LETTER.**

576.    On or around February 8, 2018, Dr. Halikman contacted H/R and E/R to file a case against Dr. Kristin Nelson for **RETALIATION** for her November 15, 2017 letter; and

577.    On or around February 8, 2018, Dr. Halikman filed a case against Dr. Kristin Nelson for harassment, discrimination and retaliation; and

578.    On or around February 2018, Dr. Halikman filed a case against Dr. Kristin Nelson for refusing to approve vacation time and ongoing harassment over the Holiday time that was taken, and

579.    On or around February 8, 2018, Dr. Halikman filed a case against  Dr. Kristin Nelson for hostile work environment and interference with her ability to do her work.

580.    On or around February 2018, Continued harassment by Drs. Helmick and Nelson, and

581.    On or around February 9, 2018, Dr. Halikman contacts H/R and tells them that the ongoing harassment by Dr. Kristin Schaad Nelson is making her ill, and she needs it to end, and

582.    On or around February 2018, Dr. Nelson states she is adding to a corrective action plan for taking Holiday time without her permission (permission was granted by the Holiday Committee that granted everyone's Holiday time off), and

583.    On or around February 2018, Dr. Nelson refuses to grant Dr. Halikman 2/19 requested day off, to spend time with a loved one, and

584.    On or around February 14, 2018, Drs. Kantor and Nelson hold a meeting and secretly tape record it in violation of California and other states wire tapping laws. This meeting follows a CNN story about Medical Directors not reviewing clinicals at another carrier.  Dr. Robert Kantor introduces himself in the meeting, even though the Medical Directors all know who he is, and states matter-of-factly that we should all "just keep reviewing the clinicals like we always tell you to do," to which a series of texts and emails start spreading among Team members stating how "Dr. Kantor told me just the opposite, he told me to skip the clinicals entirely to get my numbers up."  Dr. Jennifer Lewiston states in one text, *"What a liar Bob Kantor is – He explicitly told me to skip the clinicals entirely to increase my speed and the volume of case that I do!"* The only thing the meeting established is that Dr. Robert Kantor is a total liar. (**DEPARTMENT OF INSURANCE VIOLATION**), and

585.    On or around February 14, 2018, Dr. Nelson "weaponizes" the Case Assignment Tool so that Dr. Halikman's inbox is flooded with Expedited cases several a minute only seconds apart, and

586.    On or around February 15, 2018, Dr. Nelson wants an impromptu meeting with Dr. Halikman which makes me physically ill,

587.    On or around February 15, 2018, Dr. Halikman is sick and take the remainder of the day off, but does send a notice to her Teammates that she is ill, and

588.    When Dr. Halikman tries to get on-line later in the evening to check her queue, she notices that her clearance has been revoked by Dr. Kristin Schaad Nelson. An e-mail states, *"Secure remove access has been completed. A Supervisor Review of Employee Access was performed and it was determined the access is no longer needed."*

589.    On or around February 18, 2018, Dr. Kristin Nelson enters Dr. Halikman's annual review for 2017 in which she gives Dr. Halikman a 3/5 for innovation (despite the fact that Dr. Halikman's Team voted her # 1 out of 80 medical directors for innovation ideas); and

- 1/5 for what she calls "low emotional intelligence" which she does to the other women as well, and

- She libels Dr. Halikman in her statements as well, and

- 2/5 for Quality (in spite of independent Audits rating Dr. Halikman 100% accuracy for the last few months of 2017 and the entire first quarter of 2018) – another lie;

590.    H/R resources responds 3 weeks after Dr. Halikman filed an urgent complaint about Dr. Nelson with them,

591.    On or about February 27, 2018, Dr. Kristin Nelson sends a letter stating that "Dr Halikman is leaving effective immediately and there is now an opening to refer a surgeon," but no such position was actually being funded by United. They also put false notices on several job websites for a position which they knew was not being funded. It is unclear why United would falsely advertise for a job that was not funded; and

592.     On or about March/April 2018, several more women leave United due to harassment. Nearly all of them are on Dr. Kristin Schaad Nelson's Team.

593.     On or around April, Dr. Velarde announces that United's rate of denying care and services is 60% and she advises the team to "keep up the good work."

594.     On or around April, Drs. Denise Christian and Matt Shelley admit to the entire Team that there were going to be layoffs but since so many women quit in February and March 2018, "not on their Timeline for trimming the herd, there's now a manpower shortage." They try to reassure people to stop them from quitting.

595.     One Medical Director is upset that her name was used to sign off on a case completed by a Physician Assistant without her knowledge. The P.A. denied an insulin pump and the child wound up in a hospital in a diabetic coma. The SME for Durable Medical Equipment is Jack Sanders, real estate agent in Hawaii; and

596.     On or around August 2018, Dr. Kristin Schaad Nelson discloses Dr. Halikman's PHI, without her knowledge or consent, to Ms. Joanne Seltzer.

597.     On or around August 2018, Kristin Schaad Nelson slanders and libels Dr. Halikman; and

598.     On or around August 2018, Ms. Seltzer enters Dr. Halikman's PHI Personal Health Information, without her knowledge or consent, onto a website and submits this information to a Federal Agency, effectively and outrageously putting Dr. Halikman's PHI out into the Public Domain. **(VIOLATIONS OF HIPAA PRIVACY RULE)**

## DR.HALIKMAN QUIT HER JOB DUE TO CONSTRUCTIVE DISCHARGE

115

599.     On or about Feb 15, 2018, after nearly five years of working for United HealthCare and within 8 months of Nelson appointment as Dr. Halikman's Supervisor, and after giving up a secure position with AMR, Dr.Halikman chose to leave United rather than continue to be subject to ongoing harassment, discrimination, retaliation and abuse by Dr. Nelson.

600.     There was no legitimate business justification for United Health Care to refuse to accommodate Dr. Halikman's disability.

601.     Not only did Dr. Nelson acknowledge that Dr. Halikman **"exceeded expectations"** in her job, but she also acknowledged that Dr. Halikman was denied her Bonus because Dr. Nelson did not like her personality.  Personality was never mentioned to the Team as one of the metrics upon which a Bonus would be based.

602.     Following her discriminatory and retaliatory termination (constructive discharge), Dr. Halikman was unemployed for approximately four months and although presently employed, she works for a start up that lacks the job security of a larger corporation such as United that she was hoping to enjoy for the remaining ten (10) years until her retirement.

## CLAIMS AND DAMAGES

603.     Based upon the above allegations, Dr. Halikman maintains the following legal claims against Defendants:

## COUNT ONE
**(DISCRIMINATION IN VIOLATION OF CAL. GOV'T CODE 12940)**

604.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

605.    Defendants discriminated against Plaintiff in violation of the CAL GOV CODE 12940 by denying her equal terms and conditions of employment, including, but not limited to, terminating her employment through constructive discharge and failing to pay her earned wages including earned non-discretionary bonus 2017, despite Plaintiff being fully qualified and at all times performing her duties in a professional and competent manner, because of Plaintiff's disability, because Defendants regarded Plaintiff as disabled, and/or because Plaintiff's record of disability. And because of the Plaintiff's gender. And because of the Plaintiff's religion. And in retaliation for the Plaintiff's participation in Protected acts.

606.    Defendant has undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under CAL GOV CODE 12940.

607.    These employment practices violate the CAL GOV CODE 12940.

608.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the CAL GOV CODE 12940, Plaintiff  has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

609.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

610.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

611.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

612.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

**613.**    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

## COUNT TWO
### (VIOLATION OF DUTY OF REASONABLE ACCOMMODATION)

614.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

615.    Defendants violated their duty to provide Plaintiff with a reasonable accommodation under the CAL GOV CODE 12940 when it unilaterally rescinded an agreed-upon reasonable accommodation for Plaintiff's disabilities without any valid legitimate business

justification for doing so, and without engaging in an interactive process with Plaintiff concerning her need to for a reasonable accommodation for her disabilities.

616.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the CAL GOV CODE 12940, Plaintiff as suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

617.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

618.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

619.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

620.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

621.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and

119

Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

## COUNT THREE
### (RETALIATION IN VIOLATION OF CAL GOV CODE 12940)

622.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

623.    Defendants subjected Plaintiff to unlawful retaliation in violation of the CAL. GOV'T. CODE 12940, including, but not limited to, terminating Plaintiff's employment in response to Plaintiff's request that she be reasonably accommodated for her disability and/or disclosure of her protected rights as a "qualified individual with a disability" and/or a "disabled employee" in the workplace.

624.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the CAL. GOV'T. CODE 12940, Plaintiff as suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

625.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

626.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

627.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

628.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

629.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

630.    Defendants have retaliated against Plaintiff for having complained of disability discrimination in the terms and conditions of employment in violation of Section 704 of Title VII (42 U.S.C. § 2000e-3).

631.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities.

632.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities.

633.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

634.    As a result of the Defendants' wrongful actions complained of herein. Plaintiff has suffered severe damages in the form of humiliation, embarrassment, emotional distress, physical injury, as well as money damages including, but not limited to regular wages, overtime wages, retirement benefits, insurance benefits and pension.

635.    All of these damages have been exacerbated by the events surrounding Plaintiff's most recent discrimination, retaliation, hostile environment, disparate treatment and unlawful termination.

## COUNT FOUR
**(DISCRIMINATION IN VIOLATION OF** Fair Employment and Housing Act ("FEHA"), Los Angeles
Civil and Human Rights Ordinance 18-0086 and CAL. GOV'T. CODE 12940**)**

636.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

637.    Defendant discriminated against Plaintiff in violation of the Fair Employment and Housing Act ("FEHA"), Los Angeles Civil and Human Rights Ordinance 18-0086 and CAL. GOV'T. CODE 12940 and by denying her equal terms and conditions of employment, including, but not limited to, terminating her employment and failing to pay her earned wages, despite Plaintiff being full qualified and at all times performing her duties in a professional and competent manner, because of Plaintiff's disability, because Defendants regarded Plaintiff as disabled, and/or because Plaintiff's record of disability.

122

638.    Defendant has undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under Fair Employment and Housing Act ("FEHA"), and Los Angeles Civil and Human Rights Ordinance 18-0086 and CAL. GOV'T. CODE 12940 and the CAL. GOV'T. CODE 12940, CAL. GOV'T. CODE 12940 (a) .

639.    These employment practices violate the Fair Employment and Housing Act ("FEHA"), and Los Angeles Civil and Human Rights Ordinance 18-0086 and CAL. GOV'T. CODE 12940.

640.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Fair Employment and Housing Act ("FEHA"), and Los Angeles Civil and Human Rights Ordinance 18-0086, and CAL. GOV'T. CODE 12940 and Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

641.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

642.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

643.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

644.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

645.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future as they have done so many times in the past.

## COUNT FIVE
### (VIOLATION OF DUTY OF REASONABLE ACCOMMODATION)
### (Cal. Gov. Code 12940(m))

646.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

647.    Defendants violated their duty to provide Plaintiff with a reasonable accommodation under **(Cal. Gov. Code 12940(m))** when it unilaterally rescinded an agreed-upon reasonable accommodation for Plaintiff's disabilities without any valid legitimate business justification for doing so, and without engaging in an interactive process with Plaintiff concerning her need to for a reasonable accommodation for her disabilities.

648.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of **(Cal. Gov. Code 12940(m))**, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future

income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

649.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

650.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

651.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

652.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

653.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.


## COUNT SIX
### (RETALIATION IN VIOLATION OF (Cal. Gov. Code 12940(h))

654.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

655.    Defendants subjected Plaintiff to unlawful retaliation in violation of **(Cal. Gov. Code 12940(h))** including, but not limited to, terminating Plaintiff's employment in response to Plaintiff's request that she be reasonably accommodated for her disability and/or disclosure of her protected rights as a "qualified individual with a disability" and/or a "disabled employee" in the workplace.

656.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the **(Cal. Gov. Code 12940(h))**, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

657.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

658.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

659.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

660.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

661.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

662.    Defendants have retaliated against Plaintiff for having complained of disability discrimination in the terms and conditions of employment in violation of Section 704 of Title VII (42 U.S.C. § 2000e-3).

663.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities.

664.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities.

665.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

666.    As a result of the Defendants' wrongful actions complained of herein. Plaintiff has suffered severe damages in the form of humiliation, embarrassment, emotional distress,

physical injury, as well as money damages including, but not limited to regular wages, overtime

wages, retirement benefits, insurance benefits and pension.

667.    All of these damages have been exacerbated by the events surrounding Plaintiff's

most recent discrimination, retaliation, hostile environment, disparate treatment and unlawful

termination.


## COUNT SEVEN
### (DISCRIMINATION IN VIOLATION OF (Cal. Gov. Code 12940(a))

668.    Plaintiff incorporates by reference and re-alleges each and every allegation as set

forth above as if fully set forth herein.

669.    Defendant discriminated against Plaintiff in violation of the **(Cal. Gov. Code

12940(a))** by denying her equal terms and conditions of employment, including, but not limited

to, providing proper equipment with which to work, providing a non-hostile work environment,

terminating her employment through wrongful constructive discharge in violation of public

policy and failing to pay her earned non-discretionary wages(Bonus), despite Plaintiff being full

qualified and at all times performing her duties in a professional and competent manner, because

of Plaintiff's disability, and/or because Defendants regarded Plaintiff as disabled, and/or because

Plaintiff's record of disability.

670.    Defendant has undertaken these discriminatory practices willfully or with reckless

disregard for the Plaintiff's rights protected under - (Cal. Gov. Code 12940(a)).

671.    These employment practices violate the (Cal. Gov. Code 12940(a)) .

672.    As a direct and proximate result of Defendants' unlawful and discriminatory

conduct in violation of the (Cal. Gov. Code 12940(a)), Plaintiff has suffered and continues to

suffer monetary and/or economic damages, including, but not limited to, loss of past and future

income, compensation and benefits for which she is entitled to an award of monetary damages
and other relief.

673.    As a further proximate result of Defendants' actions, Plaintiff has and will
continue to suffer irreparable and significant damage to her personal and professional good name
and reputation.

674.    As a further proximate result of Defendants' actions taken because of Plaintiff's
disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation
and anguish and other incidental and consequential damages and expenses.

675.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an
amount equal to the value of all compensation to be earned by Plaintiff had her employment not
been interfered with, including all to be earned salary and bonuses, benefit payments, profit
sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

676.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less
than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts
sought herein.

677.    In committing the acts alleged herein, Defendants willfully acted in an outrageous
and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and
indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and
Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish
Defendants and to deter Defendants from continuing and repeating such conduct in the future.

**COUNT**                                                                                     **EIGHT**

(VIOLATION OF DUTY OF REASONABLE ACCOMMODATION)

**(The California Fair Employment and Housing Act ("FEHA"), Government Code 12900, *et***

***seq.)***

678.    Plaintiff incorporates by reference and re-alleges each and every allegation as set

forth above as if fully set forth herein.

679.    At all times relevant herein, **The California Fair Employment and Housing Act**

**("FEHA"), Government Code 12900, *et seq.,*** was in full force and effect, and binding upon

defendants. These provisions required defendants, among other things, to refrain from

discriminatory employment practices on the basis of a disability and/or medical condition.

680.    Plaintiff is a qualified individual with a disability and/or medical condition within

the meaning of FEHA, Government Code Section 12900, et seq., in that she can and could at all

times perform the essential functions of the telecommuting job that she held in the employ of

Defendant with reasonable accommodation.

681.    Defendant failed to provide a reasonable accommodation to Plaintiff for her

disability and/or medical condition, and failed to engage in a good faith interactive process to

address Plaintiff's disability and/ or medical condition and the alleged effects Plaintiff's

disability and/or medical condition had on the performance of her job, all of which resulted in

harm and/or damage to Plaintiff.

682.    Defendants violated their duty to provide Plaintiff with a reasonable

accommodation under All applicable California State Laws and in particular **("FEHA" and**

**Gov't Code 12900 *et seq.* and Cal. Gov. Code 12940(m))** when it unilaterally rescinded an

agreed-upon telecommuting status as well as a reasonable accommodation for Plaintiff's disabilities without any valid legitimate business justification for doing so, and without engaging in an interactive process with Plaintiff concerning her need to telecommute and for a reasonable accommodation for her disabilities.

683.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of ("FEHA" and Gov't Code 12900 *et seq.* and Cal. Gov. Code 12940(m)), Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

684.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

685.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

686.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

687.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

688.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

## COUNT NINE
### (RETALIATION IN VIOLATION OF CAL. GOV'T.CODE 12940 (h))

689.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

690.    Defendants subjected Plaintiff to unlawful retaliation in violation of the **CAL. GOV'T.CODE 12940 (h))**, including, but not limited to, terminating Plaintiff's employment through constructive discharge in response to Plaintiff's request that she be reasonably accommodated for her disability and/or disclosure of her protected rights as a "qualified individual with a disability" and/or a "disabled employee" in the workplace.

691.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the **CAL. GOV'T.CODE 12940 (h)**, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

692.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

693.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

694.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees should they arise and prejudgment interest at no less than 9%.

695.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

696.    In committing the acts alleged herein, Defendants repeatedly and willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

697.    Defendants have retaliated against Plaintiff for having complained of disability discrimination in the terms and conditions of employment in violation of Section 704 of Title VII (42 U.S.C. § 2000e-3).

698.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities.

699.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities.

700.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment. (wrongful constructive discharge).

701.    As a result of the Defendants' wrongful actions complained of herein. Plaintiff has suffered severe damages in the form of humiliation, embarrassment, severe emotional distress, physical injury, as well as money damages including, but not limited to regular wages, overtime wages, retirement benefits, insurance benefits and pension.

702.    All of these damages have been exacerbated by the events surrounding Plaintiff's most recent discrimination, retaliation, hostile environment, disparate treatment and unlawful termination.


## COUNT TEN
### AGAINST DEFENDANT NELSON (AIDING AND ABETTING)

703.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

704.    As a result of the aforementioned actions, Defendant Nelson, who was Plaintiff's supervisor, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability

with respect to the terms, conditions and privileges of her employment in violation of California Law, **(Cal. Gov. Code 12900, *et seq.*).**

705.    As a result of the aforementioned actions, Defendant **Nelson** has violated the **(Cal. Gov. Code 12900, *et seq.*)** by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

706.    As a result of Defendant **NELSON** discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.


## COUNT ELEVEN
### AGAINST DEFENDANT NELSON (AIDING AND ABETTING)

707.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

708.    As a result of the aforementioned actions, Defendant **Nelson,** who was Plaintiff's supervisor, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of **(Cal. Gov. Code 12900, *et seq.*).**

709.    As a result of the aforementioned actions, Defendant **Nelson** has violated the **(Cal. Gov. Code 12900, *et seq.*)** by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

710.    As a result of Defendant **Nelson**'s discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation,

deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT TWELVE
### AGAINST DEFENDANT VELARDE (AIDING AND ABETTING)

711.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

712.    As a result of the aforementioned actions, Defendant **VELARDE**, who was Plaintiff's supervisor's Supervisor and the head of the Plaintiff's Department, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of California Law, **(Cal. Gov. Code 12900,** *et seq.***).**

713.    As a result of the aforementioned actions, Defendant **VELARDE** has violated the **(Cal. Gov. Code 12900,** *et seq.***)** by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

714.    As a result of Defendant **VELARDE** discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT THIRTEEN
### AGAINST DEFENDANT VELARDE  (AIDING AND ABETTING)

715.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

716.    As a result of the aforementioned actions, Defendant **VELARDE**, who was supervisor to Plaintiff's supervisor, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of ADA, EPA, FEHA and Los Angeles Civil and Human Rights Ordinance 18-0086.

717.    As a result of the aforementioned actions, Defendant **VELARDE** has violated the **(Cal. Gov. Code 12900, *et seq.*)** by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

718.    As a result of Defendant **VELARDE**'s discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT FOURTEEN
### AGAINST DEFENDANT KANTOR (AIDING AND ABETTING)

719.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

720.    As a result of the aforementioned actions, Defendant **KANTOR**, who was Plaintiff's supervisor's Supervisor and the head of the Plaintiff's Department, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability

with respect to the terms, conditions and privileges of her employment in violation of California Law, **(Cal. Gov. Code 12900, *et seq.*).**

721.    As a result of the aforementioned actions, Defendant **KANTOR** has violated the **(Cal. Gov. Code 12900, *et seq.*)** by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

722.    As a result of Defendant **KANTOR** discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.


## COUNT FIFTEEN
### AGAINST DEFENDANT KANTOR (AIDING AND ABETTING)

723.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

724.    As a result of the aforementioned actions, Defendant **KANTOR**, who was supervisor to Plaintiff's supervisor, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of ADA, EPA, FEHA and Los Angeles Civil and Human Rights Ordinance 18-0086.

725.    As a result of the aforementioned actions, Defendant **KANTOR** has violated the **(Cal. Gov. Code 12900, *et seq.*)** by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

726.    As a result of Defendant **KANTOR**'s discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT SIXTEEN
### AGAINST DEFENDANT HELMICK (AIDING AND ABETTING)

727.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

728.    As a result of the aforementioned actions, Defendant **HELMICK**, who was Plaintiff's supervisor's Supervisor and the head of the Plaintiff's Department, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of California Law, **(Cal. Gov. Code 12900, *et seq.*)** As a result of the aforementioned actions, Defendant **HELMICK** has violated **Cal. Gov. Code 12900, *et seq.*** by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

729.    As a result of Defendant **HELMICK** discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT SEVENTEEN
### AGAINST DEFENDANT HELMICK (AIDING AND ABETTING)

730.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

731.    As a result of the aforementioned actions, Defendant **HELMICK**, who was supervisor to Plaintiff's supervisor, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on

account of her disability with respect to the terms, conditions and privileges of her employment in violation of **Cal. Gov. Code 12900,** *et seq.*

732. As a result of the aforementioned actions, Defendant **HELMICK** has violated **Cal. Gov. Code 12900,** *et seq.* by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

733. As a result of Defendant **HELMICK** 's discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT EIGHTEEN
### AGAINST DEFENDANT O'BRYANT (AIDING AND ABETTING)

734. Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

735. As a result of the aforementioned actions, Defendant **O'BRYANT**, who was Plaintiff's supervisor's Supervisor and the head of the Plaintiff's Department, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of **Cal. Gov. Code 12900,** *et seq.* As a result of the aforementioned actions, Defendant **O'BRYANT** has violated **Cal. Gov. Code 12900,** *et seq.* by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

141

736.    As a result of Defendant **O'BRYANT** discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT NINETEEN
### AGAINST DEFENDANT **O'BRYANT** (AIDING AND ABETTING)

737.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

738.    As a result of the aforementioned actions, Defendant **O'BRYANT**, who was supervisor to Plaintiff's supervisor, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of **Cal. Gov. Code 12900,** *et seq.*

739.    As a result of the aforementioned actions, Defendant **O'BRYANT** has violated **Cal. Gov. Code 12900,** *et seq.* by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

740.    As a result of Defendant **O'BRYANT** 's discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT TWENTY
### AGAINST DEFENDANT HAKIM (AIDING AND ABETTING)

741.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

742.    As a result of the aforementioned actions, Defendant **HAKIM**, who was Plaintiff's supervisor's Supervisor and the head of the Plaintiff's Department, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of California Law, **Cal. Gov. Code 12900, et seq.**

743.    As a result of the aforementioned actions, Defendant **HAKIM** has violated the **Cal. Gov. Code 12900, et seq.** by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

744.    As a result of Defendant **HAKIM** discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT TWENTY-ONE
### AGAINST DEFENDANT HAKIM (AIDING AND ABETTING)

745.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

746.    As a result of the aforementioned actions, Defendant **HAKIM**, who was supervisor to Plaintiff's supervisor, knowingly or recklessly aided and abetted the unlawful

143

employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of **Cal. Gov. Code 12900,** *et seq.*

747.    As a result of the aforementioned actions, Defendant **HAKIM** has violated **Cal. Gov. Code 12900,** *et seq.*  by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

748.    As a result of Defendant **HAKIM** 's discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT TWENTY-TWO

### AGAINST DEFENDANT SHELLEY (AIDING AND ABETTING)

749.     Plaintiff incorporates by reference and re-alleges each and every allegation as
set forth above as if fully set forth herein.

750.     As a result of the aforementioned actions, Defendant **SHELLEY**, who was
Plaintiff's supervisor's Supervisor and the head of the Plaintiff's Department, knowingly or
recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or
unlawful retaliation against Plaintiff on account of her disability with respect to the terms,
conditions and privileges of her employment in violation of California Law, **Cal. Gov. Code
12900, _et seq._** As a result of the aforementioned actions, Defendant **SHELLEY** has violated
**Cal. Gov. Code 12900, _et seq._** by aiding, abetting, inciting and coercing the unlawful
discrimination outlined herein.

751.     As a result of Defendant **SHELLEY** discrimination (and aiding, abetting and
inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation,
deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to
reputation and career, mental anguish and humiliation.

## COUNT TWENTY-THREE
### AGAINST DEFENDANT SHELLEY (AIDING AND ABETTING)

752.     Plaintiff incorporates by reference and re-alleges each and every allegation as set
forth above as if fully set forth herein.

753.     As a result of the aforementioned actions, Defendant **SHELLEY**, who was
supervisor to Plaintiff's supervisor, knowingly or recklessly aided and abetted the unlawful
employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on

145

account of her disability with respect to the terms, conditions and privileges of her employment in violation of **Cal. Gov. Code 12900,** *et seq.* As a result of the aforementioned actions, Defendant **SHELLEY** has violated **Cal. Gov. Code 12900,** *et seq.* by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

754.    As a result of Defendant **SHELLEY**'s discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT TWENTY-FOUR

### AGAINST DEFENDANT CHRISTY (AIDING AND ABETTING)

755.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

756.    As a result of the aforementioned actions, Defendant **CHRISTY**, who was Plaintiff's supervisor's Supervisor and the head of the Plaintiff's Department, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of California Law, **Cal. Gov. Code 12900,** *et seq.* As a result of the aforementioned actions, Defendant **CHRISTY** has violated **Cal. Gov. Code 12900,** *et seq.* by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

757.    As a result of Defendant **CHRISTY** discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT TWENTY-FIVE
### AGAINST DEFENDANT CHRISTY (AIDING AND ABETTING)

758.    Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

759.    As a result of the aforementioned actions, Defendant **CHRISTY**, who was supervisor to Plaintiff's supervisor, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of **Cal. Gov. Code 12900, *et seq.***

760.    As a result of the aforementioned actions, Defendant **CHRISTY** has violated **Cal. Gov. Code 12900, *et seq.*** by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

761.    As a result of Defendant **CHRISTY** 's discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT TWENTY-SIX

**AGAINST DEFENDANT UTLEY (AIDING AND ABETTING)**

762.     Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

763.     As a result of the aforementioned actions, Defendant **UTLEY**, who was Plaintiff's supervisor's Supervisor and the head of the Plaintiff's Department, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of California Law, **Cal. Gov. Code 12900, *et seq.*** As a result of the aforementioned actions, Defendant **UTLEY** has violated **Cal. Gov. Code 12900, *et seq.*** by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

764.     As a result of Defendant **UTLEY** discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

### COUNT TWENTY-SEVEN
**AGAINST DEFENDANT UTLEY (AIDING AND ABETTING)**

765.     Plaintiff incorporates by reference and re-alleges each and every allegation as set forth above as if fully set forth herein.

766.     As a result of the aforementioned actions, Defendant **UTLEY**, who was supervisor to Plaintiff's supervisor, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on

account of her disability with respect to the terms, conditions and privileges of her employment in violation of **Cal. Gov. Code 12900,** *et seq.*

767.    As a result of the aforementioned actions, Defendant **UTLEY** has violated **Cal. Gov. Code 12900,** *et seq.* by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

768.    As a result of Defendant **UTLEY**'s discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT TWENTY EIGHT

### (DISCRIMINATORY DISCHARGE)

769.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

**770.**    Defendants have unlawfully arid intentionally constructively discharged Plaintiff based on her disabilities in violation of **CAL. GOV. CODE 12900, *et seq.***

771.    And the Defendants have unlawfully arid intentionally constructively discharged Plaintiff based on her religion in violation of

**CAL. GOV. CODE 12900, *et seq.***

772.    And the Defendants have unlawfully arid intentionally constructively discharged Plaintiff on the basis of her gender in violation of **CAL. GOV. CODE 12900, *et seq.***

773.    And the Defendants have unlawfully arid intentionally withheld payment of earned wages including but not limited to a 2017 earned non-discretionary Bonus,

774.    And the Defendants have unlawfully arid intentionally paid the Plaintiff less than men doing the same job in violation of the Equal Pay Act (EPA)

775.    And the Defendants have unlawfully arid intentionally violated the Plaintiff's right to privacy by disseminating her personal health information (PHI) without her knowledge and consent multiple times and in so doing violated the HIPAA Privacy Rules of Health and Human Services (HHS) Office of Civil Rights (OCR) and any and all applicable Federal and State and City of Los Angeles Laws.

776.    And the Defendants have unlawfully arid intentionally violated the Plaintiff's rights by slandering and libeling her in violation of State and Federal Law; and

150

777.    And the Defendants have unlawfully arid intentionally andn wrongfully constructively discharged Plaintiff based on her participation in a protected act in violation of anti-retaliation laws under **CAL. GOV'T. CODE 12940(h).**

778.    As a result of the Defendants' wrongful actions complained of herein, Plaintiff has suffered severe damages in the form of humiliation, embarrassment, emotional distress, physical injury, as well as money damages including, but not limited to regular wages, retirement benefits, insurance benefits and pension.

779.    All of these damages have been exacerbated by the events surrounding Plaintiff's most recent discrimination, retaliation, hostile environment, disparate treatment and unlawful termination.

## PUNITIVE DAMAGES – BAD FAITH

780.    It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly. In light of Defendants' obvious and blatant bad faith, as well as their unethical, immoral, inhumane, ruthless, cruel, corrupt and malicious wrongdoing and breach of other duties, ***punitive damages*** should be assessed against Defendants so that they be deterred from attempting such harmful employment practices in the future.

### FOR ALL COUNTS AGAINST DEFENDANT KRISTIN SCHAAD NELSON, ARE ALL ALSO CHARGED AGAINST EACH OF THE ADDITIONAL DEFENDANTS AS WELL WHO DIRECTLY OVERSAW, WITNESSED OR CONTRIBUTED TO THE DAMAGES INFLICTED BY DR. KRISTIN NELSON IN MAJOR

151

**PART THEREOF.**

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.    A Declaratory Judgment declaring that the acts complained of herein violate the rights of Plaintiff as guaranteed under EPA, FEHA, HIPAA, all applicable Los Angeles City, CALIFORNIA STATE AND FEDERAL LAWS, Los Angeles Civil and Human Rights Ordinance 18-0086; and CAL. GOV'T CODES 12940, 12940(j), 12940 (a), 12940(k), 12940(h), 12900 et seq.

II.   A judgment granting equitable relief directing Defendants to cease and desist from exposing Plaintiff to discrimination and retaliation;

III.  A judgment granting equitable relief directing Defendants to cease and desist from making slanderous and libelous statements about Plaintiff;

IV.   A judgment awarding Plaintiff compensatory damages for mental anguish, loss of dignity, humiliation, physical injury, and injury to

V.    privacy under HIPAA, in an amount that is fair, just and reasonable, to be determined at trial, including reasonable costs and fees, as provided under HIPAA, but not less than $3,000,000.00 and not less than an additional $50,000 per HIPAA filing;

VI.   A judgment directing Defendants to reimburse and make Plaintiff whole for any and all earnings she would have received but for Defendants' discriminatory treatment and unlawful dismissal, including but not limited to, 2017 Bonus, back pay, lost earnings in 2018 and pension benefits;

VII.  A judgment awarding Plaintiff compensatory damages for mental anguish, loss of

dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to be determined at trial, including reasonable costs and fees, as provided under ADA, but not less than $3,000,000.

VIII.    A judgment awarding Plaintiff double damages for Plaintiff's intentional discrimination;

IX.    A judgment awarding Plaintiff front pay;

X.    A judgment awarding Plaintiff punitive damages;

XI.    An award of prejudgment interest, costs and filing fees; and

XII.    A judgment to sanction and revoke any and all professional medical licenses of the Defendants as the court deems appropriate because of the risk these physicians present to others and because of their actions, which will come out in trial, the risks they present to the population at large in their respective capacities as Medical Directors and Executives at the largest health insurance company in the United States overseeing care to tens of millions of patients throughout all fifty States;

XIII.    Such other and further relief that the Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury

on all questions of fact raised by the complaint.


Dated: Los Angeles, California
       March 5, 2019

                              Respectfully submitted,


                              **Dr. Amy Halikman**
                              **Board Certified Physician & Surgeon**


                              By:   _____
                                    Amy Halikman, M.D.

155